17 F.3d 1553
 62 USLW 2570, Fed. Sec. L. Rep. P 98,109
 C.L. GRIMES and G.W. Holbrook, on their own behalf and on
behalf of all persons similarly situated, Appellants
v.
VITALINK COMMUNICATIONS CORPORATION; Network Systems
Corporation; Leslie G. Denend; J. Daniel
McCranie; Charles J. Abbe; Harry T.
Rein; Lyle D. Altman.
 No. 93-1268.
 United States Court of Appeals,
Third Circuit.
 Argued Oct. 8, 1993.
Decided March 9, 1994.
Sur Petition for Rehearing April 6, 1994.
 
 Thaddeus Holt (argued), Kittredge, Donley, Elson, Fullem & Embrick, Philadelphia, PA, counsel for appellants C.L. Grimes and G.W. Holbrook.
 Steven J. Rothschild (argued), Skadden, Arps, Slate, Meagher & Flom, Wilmington, DE, counsel for appellees Vitalink Communications Corporation, Network Systems Corporation, Leslie G. Denend, J. Daniel McCranie, Charles J. Abbe, Harry T. Rein, Lyle D. Altman.
 Before: HUTCHINSON, COWEN and NYGAARD Circuit Judges.
 OPINION OF THE COURT
 COWEN, Circuit Judge.
 
 
 1
 This case presents the question whether a state court has the power to allow parties as part of a comprehensive court-approved settlement to release exclusive federal securities law claims arising from the same transaction or occurrence as the state law matters before it, even though the state court would not have jurisdiction to hear the federal claims in the first instance. A subsidiary issue presented is whether a non-resident owner of corporate stock who tendered his shares to the Delaware corporation in response to a proxy offer following a merger transaction had sufficient minimum contacts to be bound by the settlement and release entered into on behalf of the plaintiff class of shareholders by a Delaware state court. Answering both questions in the affirmative, we will affirm the district court.
 
 I.
 
 2
 The complicated background giving rise to this lawsuit in federal court started with a merger agreement between two Delaware corporations. Vitalink Communications Corporation ("Vitalink") was a manufacturer of computer internetworking products known as wide area bridges. Network Systems Corporation ("Network"), a manufacturer of data communications equipment which connects mainframe computers, minicomputers, and computer networks, entered into a merger agreement on May 6, 1991, by which it would acquire the stock of Vitalink. It is not necessary for purposes of this opinion to lay out precisely the intricate details of the merger negotiations and the final agreement, other than to note that Network ultimately agreed to pay $10.50 in cash for each share of outstanding Vitalink stock.
 
 
 3
 On May 13, 1991, Leslie G. Denend, President of Vitalink, sent a letter to all stockholders stating that the Vitalink Board of Directors had unanimously approved the merger, indicating that the Board of Directors believed the terms of the merger were fair, and recommending that the stockholders accept the offer. The plaintiffs in this action, C.L. Grimes, a Pennsylvania resident, and G.W. Holbrook, a Connecticut resident, were among the Vitalink stockholders.
 
 
 4
 Shortly after the merger agreement was announced seven state law actions were commenced, four in Delaware and three in California. The plaintiffs in these cases alleged that the Vitalink defendants breached their fiduciary duties and that the Network defendants aided and abetted the Vitalink defendants in doing so. The Delaware cases were consolidated and the parties engaged in expedited discovery. Within several days of commencing discovery, the parties agreed to a settlement. The California and Delaware plaintiffs entered into a Stipulation and Agreement of Compromise, Settlement and Release on June 13, 1991. They agreed to settle the dispute and release all claims arising from the merger transaction[1] in exchange for a ten-day extension of the merger offer, a reduction in the amount payable to Network under a stock option agreement if a third party made an offer for Vitalink, and for an amendment limiting the reimbursement of Network's fees by Vitalink in the event the merger agreement was terminated. In addition, the defendants agreed not to oppose an application by plaintiffs' counsel for an award of attorneys' fees not to exceed $275,000, and expenses not greater than $25,000.
 
 
 5
 The merger was completed on July 1, 1991, when Vitalink became a wholly owned subsidiary of Network. Vitalink shares that were not tendered were converted into the right to receive $10.50 per share or to seek appraisal. A notice of the completed merger was sent by Vitalink to all shareholders on July 11, 1991. In that letter, stockholders were given the option of surrendering their shares to the paying agent in exchange for $10.50 in cash per share, or to seek appraisal of the shares pursuant to Delaware corporation law. Mr. Holbrook tendered his shares in response to the letter from Vitalink, while Mr. Grimes did not do so.
 
 
 6
 On July 18, 1991, the Delaware Court of Chancery certified the Vitalink stockholders as a non-opt-out settlement class pursuant to Court of Chancery Rule 23(b)(1) and (2).[2] This class, consisting of all persons who owned Vitalink common stock between May 6, 1991 and July 1, 1991, included plaintiffs Grimes and Holbrook. A notification letter was sent to all class members discussing the pending class action litigation, describing the settlement benefits to the class, indicating that all class members had an opportunity to oppose settlement, and notifying the class of the date of the settlement hearing. Upon receiving written notice, a group of stockholders including Grimes filed objections to the settlement and presented argument at the subsequent hearing. Mr. Grimes and the other objectors argued that the interests of the stockholders were not adequately represented by the class representatives and that the settlement agreement did not result in any material benefits for the class. Mr. Holbrook did not enter an appearance in the Delaware state court proceedings and never opposed settlement of the class action claims.
 
 
 7
 The Delaware Court of Chancery approved the settlement by memorandum opinion issued on November 8, 1991. See In re Vitalink Communications Corp. Shareholders Litig., [1991-92 Transfer Binder] Fed.Sec.L.Rep. (CCH) p 96,585, 1991 WL 238816 (Del.Ch. Nov. 8, 1991). Mr. Grimes and the other objectors appealed this decision to the Delaware Supreme Court, which affirmed the Court of Chancery in an unpublished disposition without opinion. See Grimes v. John P. McCarthy Profit Sharing Plan, 610 A.2d 725 (Del.1992) (table). In a petition for certiorari, Mr. Grimes argued that the Delaware court proceedings violated due process because the court did not develop a sufficient record to consider whether absent class members were adequately represented. The Supreme Court denied this petition on October 5, 1992. Grimes v. John P. McCarthy Profit Sharing Plan, --- U.S. ----, 113 S.Ct. 179, 121 L.Ed.2d 124 (1992).
 
 
 8
 Prior to the disposition of the writ of certiorari, Grimes and Holbrook filed the present action in the U.S. District Court for the Eastern District of Pennsylvania. In this case, the plaintiffs alleged that the defendants violated their duty of disclosure pursuant to sections 10(b) and 14(e) of the Securities Exchange Act of 1934. See 15 U.S.C. Secs. 78j & 78n(e) (1988). Federal courts have exclusive jurisdiction over suits alleging violations of these securities law provisions. 15 U.S.C. Sec. 78aa (1988);[3] Cramer v. General Tel. & Elecs. Corp., 582 F.2d 259, 270 n. 15 (3d Cir.1978), cert. denied, 439 U.S. 1129, 99 S.Ct. 1048, 59 L.Ed.2d 90 (1979). In addition, the plaintiffs complained that the procedures employed by the state courts in resolving the Delaware action denied them due process of law.
 
 
 9
 Vitalink, Network, and the other defendants moved the district court to dismiss the federal action based on the judgment in the Delaware action. In essence, they argued that the state court approved a release of all claims arising from the merger, including exclusive federal claims, and that the federal court was required to adhere to that judgment consistent with full faith and credit.[4] Grimes and Holbrook opposed dismissal of their suit and requested the district court to treat the motion as one for summary judgment. Likewise, they moved the district court for partial summary judgment and submitted several supporting documents to the court.
 
 
 10
 In a memorandum opinion dated February 27, 1993, the district court denied plaintiffs' partial motion for summary judgment and granted defendants' motion for summary judgment. Grimes v. Vitalink Communications Corp., No. 92-2722, 1993 WL 56032 (E.D.Pa. Feb. 27, 1993). The district court ruled that the legal doctrines of collateral estoppel and release bar the federal court from considering the alleged violations of federal securities law stemming from the merger. Id. at *2-5 First, the district court found that the plaintiffs in this case were members of the non-opt-out state court class who were bound by the broad release approved by the Delaware Court of Chancery. Id. at *2-4 Second, and alternatively, the district court held that this federal securities case is barred by the collateral estoppel effect of the Delaware judgment because the predicate facts that underlie the federal case, which primarily involve issues of nondisclosure, overlap significantly with facts conclusively established in the state court proceeding. Id. at *4-5 Finally, the district court also examined the federal plaintiffs' allegation that they were denied due process in the state court proceedings and concluded that this claim was not meritorious. Id. at * 5-6.II.
 
 
 11
 The district court had jurisdiction over this case pursuant to section 27 of the Securities Exchange Act of 1934. 15 U.S.C. Sec. 78aa. By granting the defendants' motion for summary judgment, the district court ordered the case dismissed. We have appellate jurisdiction pursuant to 28 U.S.C. Sec. 1291 as plaintiffs have appealed a final judgment of dismissal.
 
 
 12
 The district court's grant of summary judgment in favor of defendants is subject to plenary review. Wheeler v. Towanda Area School Dist., 950 F.2d 128, 129 (3d Cir.1991); American Medical Imaging Corp. v. St. Paul Fire and Marine Ins. Co., 949 F.2d 690, 692 (3d Cir.1991). To the extent the district court interpreted and applied Delaware law, the district court is not entitled to deference. The determinations regarding state law, where appropriate, will be reviewed de novo. Salve Regina College v. Russell, 499 U.S. 225, 231, 111 S.Ct. 1217, 1221, 113 L.Ed.2d 190 (1991); Borse v. Piece Goods Shop, Inc., 963 F.2d 611, 613 (3d Cir.1992).
 
 III.
 A.
 
 13
 The central issue raised in this appeal is whether a state court, which does not have subject matter jurisdiction to hear exclusive federal claims, may nevertheless approve a settlement and release of those claims by the parties. The plaintiffs urge this court to adhere to the view that the Delaware release does not extinguish the exclusive federal claims because Congress did not authorize Delaware or other state courts to hear such claims in the first instance. As a starting point, however, it is important to emphasize that the Delaware court did not purport to exercise any inherent power to release causes of action that it had no jurisdiction to entertain. Rather, the Delaware court only acted to enter a settlement agreement that was initiated, negotiated, and adopted by the parties to a lawsuit that was properly before it.
 
 
 14
 It is significant to note that a release may take one of at least two distinct forms. In the first situation, a release may be entered into by parties engaged in a colorable legal dispute for which no formal complaint has been filed. The parties may negotiate a settlement of the dispute and in the process execute a release of all claims. The release acts as a simple contract between two private parties not engaged in a lawsuit. If one of the parties later breaches that contract by filing a complaint stemming from the relevant transaction, then the defendant may present the release as a defense to the lawsuit and argue that the claims alleged in court were contracted away by the plaintiff. Assuming that there is no relevant exception to the release defense, for instance that the release was only entered into on the basis of deception or coercion, see In re Complaint of Bankers Trust Co., 752 F.2d 874, 885 (3d Cir.1984), then the contract should be given full preclusive effect by the court.
 
 
 15
 In the second situation, which encompasses the case sub judice, a lawsuit has been commenced by one party asserting claims against the other. When the parties in a pending case negotiate a settlement, the resulting court order dismissing the case is a final judgment in that lawsuit. As a judgment, the settlement and release of claims is a contract that not only is agreed upon by the parties, but also is stamped with the imprimatur of the court with jurisdiction over the parties and the subject matter of the lawsuit. See Nottingham Partners v. Trans-Lux Corp., 925 F.2d 29, 33 n. 2 (1st Cir.1991). Thus, the release is not simply a contract entered into by private parties, but is one that has been given a stamp of approval by the court.
 
 
 16
 When the underlying legal dispute is a class action, as is the present case, then the court has more than a ministerial duty to enter the negotiated settlement and release as a judgment. In this circumstance, the court has an elevated duty to ensure that the settlement is fair and adequate to all the plaintiff class members, not just the named representatives who negotiated its substantive terms. This duty is particularly acute when the class action is one certified under Federal Rules of Civil Procedure 23(b)(1) or (2), or their state counterparts, because the class members have been denied an opportunity to opt out of the putative class. In effect, all ordinary class members are bound by the deal struck by their named representatives in the event the court determines that they were adequately and fairly represented during the course of the negotiations.
 
 
 17
 That is not to say, however, that non-representative class members are without recourse in the event that they do not feel the negotiated settlement and release is in their individual or the class' best interest. When this fairly usual circumstance arises, the objecting class members must be given an opportunity to address the court as to the reasons the proposed settlement is unfair or inadequate. The court then rules as to the adequacy and fairness of the settlement. See, e.g., Girsh v. Jepson, 521 F.2d 153, 156-57 (3d Cir.1975) (discussing the factors a trial court should utilize when determining the fairness of a class action settlement for absent members of the plaintiff class).
 
 
 18
 As the district court noted, Grimes, 1993 WL 56032, at * 3, the federal plaintiffs pursuing this case on appeal were provided with such an opportunity in the state court litigation. As the district court stated:
 
 
 19
 The plaintiffs, as class members, received notice of the Delaware proceedings and were provided an opportunity to be heard. Indeed, plaintiff Grimes vigorously exercised this opportunity. Both the Delaware Chancery Court and the Delaware Supreme Court rejected Mr. Grimes' disclosure claims and found the settlement to be fair to the Vitalink stockholders.
 
 
 20
 Id. (citing the Delaware court dispositions); see also In re Vitalink, [1991-92 Transfer Binder] Fed.Sec.L.Rep. (CCH) p 96,585, at 92,743-45, 1991 WL 238816 (Del.Ch. Nov. 8, 1991). Not only did plaintiff Grimes pursue the adequacy of representation and disclosure claims through the Delaware court system to its highest court, but when relief was denied he petitioned the United States Supreme Court to hear the case. When the Supreme Court declined to disturb the decision of the Delaware Supreme Court, see Grimes, --- U.S. at ----, 113 S.Ct. at 179, he and the other class members had been granted all the process that was due. The members of the class, including Holbrook and Grimes, were provided an opportunity to be heard, actually litigated, and lost on the issue of whether they were deprived due process in the state court proceeding.
 
 
 21
 The plaintiffs' attempt to relitigate the issue of whether they were adequately represented during the settlement negotiations and whether the state court considered sufficient evidence to make its determination is even less compelling than that of the federal plaintiffs in Nottingham Partners, the most analogous case on point. In Nottingham Partners, the plaintiffs filed suit in federal court "in vain pursuit of back-door relief" without even appealing the state court adjudication to the United States Supreme Court. 925 F.2d at 33. Here, the objectors pursued their direct appeal all the way to the Supreme Court without obtaining relief.
 
 B.
 
 22
 Although plaintiffs concede they pursued the adequacy of representation issue on appeal through the Delaware court system, they argue that such process cannot bind non-resident, non-objecting class members like Holbrook who never entered an appearance during the pendency of the Delaware litigation.[5] Plaintiffs would even take this argument one step further to assert that the Delaware judgment does not bind Holbrook because he did not formally consent to personal jurisdiction in the Delaware court and because he does not have "minimum contacts" with this forum for purposes of this adjudication. See International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945).
 
 
 23
 Although the class members in the present case were not provided with an opportunity to opt out, the state court had the requisite power to bind absent class members as long as they had minimum contacts with the forum and they were not otherwise denied due process. See id. at 317-18, 66 S.Ct. at 159 (minimum contacts in and of themselves suffice for specific jurisdiction). We first consider whether Holbrook had sufficient minimum contacts with the Delaware forum to be bound by its judgment. Addressing this issue, a Delaware court has held that it may exercise in personam jurisdiction over absent members of a plaintiff class who have not been provided an opportunity to opt out based solely on the fact of ownership of Delaware corporate stock. Hynson v. Drummond Coal Co., 601 A.2d 570, 575-79 (Del.Ch.1991). In Hynson, Chancellor Allen stated that:
 
 
 24
 it is not unreasonable--not inconsistent with traditional notions of fairness ...--to conclude that the law has long put the buyer of corporate stock on notice that corporate rights attaching to stock ownership may be adjudicated in a single proceeding in another jurisdiction, including at a minimum the corporation's state of incorporation.
 
 
 25
 Id. at 579 (citing Shaffer v. Heitner, 433 U.S. 186, 219-28, 97 S.Ct. 2569, 2588-92, 53 L.Ed.2d 683 (1977) (Brennan, J., concurring in part and dissenting in part)). Such an exercise of personal jurisdiction is inherently limited to adjudication of rights associated with ownership of that stock. Id. Thus, stock ownership alone suffices for "specific jurisdiction" but not "general jurisdiction."
 
 
 26
 We have long recognized an important distinction between basing personal jurisdiction in a particular forum on contacts that are unrelated to the claim being adjudicated (general jurisdiction), as opposed to basing personal jurisdiction on contacts directly related to the claim or claims at issue (specific jurisdiction). E.g., Dollar Sav. Bank v. First Security Bank of Utah, 746 F.2d 208, 211 (3d Cir.1984); Compagnie des Bauxites de Guinea v. Insurance Co. of N. Am., 651 F.2d 877, 889 (3d Cir.1981) (Gibbons, J., dissenting in part) ("Specific and general jurisdiction analyses are quite distinct."), aff'd sub nom. Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinea, 456 U.S. 694, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982). Unlike establishing general jurisdiction where the party must be shown to have "maintained continuous and substantial forum affiliations," Dollar Sav. Bank, 746 F.2d at 212, establishing specific jurisdiction, at a minimum, requires only that a party be shown to have committed at least one act in the relevant forum which is substantially related to the claim being adjudicated, see Carteret Sav. Bank, FA v. Shushan, 954 F.2d 141, 146-48 (3d Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 61, 121 L.Ed.2d 29 (1992). The claims adjudicated in the Delaware Court of Chancery involved the duties of care and disclosure exercised by the members of the Vitalink Board of Directors in accepting Network's merger offer, as well as the fairness and adequacy of representation by the class representatives. An appropriate basis for the Delaware court's power to bind non-resident shareholders in such a proceeding is ownership of Vitalink stock[6] together with any other activity engaged in by the members of the class pursuant to their shareholder rights. Thus, in this collateral attack we are concerned with whether the Delaware Court of Chancery had specific jurisdiction to bind non-resident members of the plaintiff class like Holbrook.
 
 
 27
 In the present case, plaintiff Holbrook and all other class members owned stock in Vitalink, a Delaware corporation. Nevertheless, we need not decide whether the single act of purchasing and owning stock in a Delaware corporation would provide sufficient contacts for the state court to exercise specific jurisdiction over every member of the class because the record discloses that Holbrook had an important further contact with the Delaware forum. By surrendering his shares in response to the tender offer with knowledge of his status as a member of the plaintiff class in a pending class action lawsuit containing all the attendant procedural protections designed to ensure that only a fair and adequate settlement judgment would be entered by the court, Holbrook purposefully availed himself of the privilege of having the Delaware Court of Chancery finally, and in a single lawsuit, determine the adequacy of the settlement agreement, "thus invoking the benefits and protections of its laws." Hanson v. Denckla, 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958).
 
 
 28
 Prior to class certification, each member, including Holbrook, was provided with notice that the Vitalink Board had accepted a merger offer from Network that would provide a cash payment of $10.50 per share. This notice was followed by a letter from the Delaware Court of Chancery discussing the pendency of the class action litigation, describing the terms of the settlement agreement, and indicating that every class member had the right to oppose the settlement at a formal hearing. In response to these notifications, Holbrook elected to tender his shares to the Delaware corporation in exchange for the merger price. This affirmative act provided an important further contact with the Delaware forum. Based on his ownership of stock in Vitalink, a Delaware corporation, and his additional act of tendering his shares, we conclude that Holbrook had sufficient contacts with Delaware for its courts to exercise in personam jurisdiction for the limited purpose of determining the fairness of the settlement with respect to his stock ownership rights.[7]
 
 
 29
 Turning to the issue of the adequacy of process, the Supreme Court in a related context has indicated that the due process protections required for out-of-state class plaintiffs are significantly lower than those needed for defendants. Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 808-11, 105 S.Ct. 2965, 2972-74, 86 L.Ed.2d 628 (1985). Plaintiffs require fewer due process protections because there are inherent protections built into the class action device and because they are subjected to lesser burdens than defendants. Id. at 809-11, 105 S.Ct. at 2973-74. Thus, the Delaware state court need only have provided "notice plus an opportunity to be heard and participate in the litigation" in order to satisfy due process.[8] Id. at 812, 105 S.Ct. at 2974.
 
 
 30
 The Delaware Court of Chancery sent by mail to each class member, including Holbrook, written notice of the pendency of the class action containing a full disclosure of the proposed settlement and its ramifications.[9] This disclosure statement also notified all class members that a hearing to determine the fairness and reasonableness of the settlement had been scheduled for September 16, 1991 before the Delaware Court of Chancery. The class members were invited to appear at the hearing to "present any evidence or arguments that may be proper and relevant" concerning the settlement upon providing ten days written notice of their intent to appear. App. at 535. Despite receiving written notice and an opportunity to challenge the settlement, Holbrook made a conscious choice to accept the tender offer price of $10.50 per share without objecting. Although the present class members were not provided with an opportunity to opt out of the class, we conclude that the Delaware Court of Chancery provided sufficient due process protections to bind absent class members like Holbrook who failed to appear and object to the settlement.
 
 
 31
 The plaintiffs contend that In re Real Estate Title & Settlement Servs. Antitrust Litig., 869 F.2d 760, 762 (3d Cir.), cert. denied sub nom. Chicago Title Ins. Co. v. Tucson Unified School Dist., 493 U.S. 821, 110 S.Ct. 77, 107 L.Ed.2d 44 (1989), provides support for the proposition that the state court could not release Holbrook's federal claims because it did not have personal jurisdiction to bind him. We agree with the district court, see Grimes, 1993 WL 56032, at * 3, that this reading of Real Estate Title is mistaken.
 
 
 32
 If at all relevant to this case, Real Estate Title stands only for the limited principle that "an absent class member can[not] be enjoined from relitigation if the member does not have minimum contacts with the forum" or consent to jurisdiction. 869 F.2d at 769 (emphasis in original). The present case does not involve a suit brought by the merging corporations to enjoin the federal plaintiffs from relitigating any claims or issues. Rather, the defendants have only raised the state court release as a defense--it is a judgment that precludes relitigation of all claims that were released by the parties. More importantly, we have already concluded that Holbrook had sufficient contacts with Delaware to be bound by the judgment of the Court of Chancery concerning his Vitalink stock ownership rights. Therefore, Real Estate Title does not change our analysis of the personal jurisdiction issue.
 
 
 33
 We therefore conclude that the Delaware court had in personam jurisdiction over the class members, including Holbrook, who tendered their shares in response to the proxy mailing and who did not make an appearance at the hearing to voice objections to the adequacy of the negotiated settlement. Both Grimes and Holbrook were provided sufficient process by the Delaware court system to challenge the settlement. Despite the objections actually lodged, the settlement and release were approved by the Delaware court and thereby bind all who were parties to the lawsuit. As members of the plaintiff class, Grimes and Holbrook are bound by the terms of the release that was entered into on their behalf.
 
 C.
 
 34
 We next consider whether the release defense interposed by the federal court defendants applies to preclude the federal securities case from proceeding forward. In the federal lawsuit, the plaintiffs have alleged claims that were resolved by the final judgment entered into by the state court.[10] Even though the state court did not have subject matter jurisdiction to consider a suit alleging violations of the federal securities laws, the judgment entered by the court must be given due accord by a subsequent federal court entertaining a lawsuit based upon facts and transactions conclusively determined in the state court proceeding.
 
 
 35
 The district court made a factual finding that Grimes presented arguments during the state court proceeding concerning disclosure requirements under federal law. Grimes, 1993 WL 56032, at * 2.[11] The facts that underlie the federal non-disclosure claims were actually litigated during the state court proceeding and were conclusively resolved against the objectors, here the federal plaintiffs. Grimes, 1993 WL 56032, at * 5 ("[T]he plaintiffs and the objectors, including plaintiff Grimes, actually litigated the disclosures accompanying defendants' offer and merger into N[etwork]"). See also In re Vitalink, [1991-92 Transfer Binder] Fed.Sec.L.Rep. (CCH) p 96,585, at 92,743-45, 1991 WL 238816 (Del.Ch. Nov. 8, 1991) (the Delaware Court of Chancery fully considered and rejected all of the objectors' non-disclosure arguments). As a result, the plaintiffs cannot relitigate in federal court the issues of non-disclosure and fairness of the settlement that were conclusively determined in the Delaware proceeding.
 
 
 36
 We are compelled to conclude that the present lawsuit is barred by the terms of the federal full faith and credit statute. See 28 U.S.C. Sec. 1738. "The preclusive effect of a state court judgment in a subsequent federal lawsuit generally is determined by the full faith and credit statute, which provides that state judicial proceedings 'shall have the same full faith and credit in every court within the United States ... as they have by law or usage in the courts of such State ... from which they are taken.' " Marrese v. American Academy of Orthopaedic Surgeons, 470 U.S. 373, 380, 105 S.Ct. 1327, 1331-32, 84 L.Ed.2d 274 (1985) (quoting 28 U.S.C. Sec. 1738). In Marrese, the Court considered whether the federal full faith and credit statute operates to preclude a federal court from considering exclusive federal antitrust claims that arose from the same transaction that was the subject of a prior state law action in which the state court entered a final judgment dismissing all claims.
 
 
 37
 The Court held that the federal full faith and credit statute can operate to bar the relitigation of issues decided by the state court, even though the state court would not have subject matter jurisdiction to consider the federal claims in the first instance, if state law would give the state court judgment preclusive effect. Id. at 380-81, 105 S.Ct. at 1332. Viewed properly as an interpretation of the full faith and credit statute, the Marrese decision is consistent with earlier Supreme Court cases requiring a subsequent federal court to look to state law to determine whether issue preclusion is a necessary consequence of the prior state court litigation. See Migra v. Warren City Sch. Dist. Bd. of Educ., 465 U.S. 75, 81, 104 S.Ct. 892, 896, 79 L.Ed.2d 56 (1984); Kremer v. Chemical Const. Corp., 456 U.S. 461, 480-82, 102 S.Ct. 1883, 1897-98, 72 L.Ed.2d 262 (1982) (The full faith and credit statute "does not allow federal courts to employ their own rules of res judicata in determining the effect of state judgments. Rather, it goes beyond the common law and commands a federal court to accept the rules chosen by the State from which the judgment is taken."); cf. Allen v. McCurry, 449 U.S. 90, 95-96, 101 S.Ct. 411, 415-16, 66 L.Ed.2d 308 (1980) (federal courts are required to give collateral estoppel effect to prior state court judgments when state courts would do so). Thus, the Supreme Court instructs a federal court to inquire into the scope of state preclusion law when applying the full faith and credit statute to a prior state court judgment.
 
 
 38
 For present purposes, we find it unnecessary to determine whether operation of the full faith and credit statute could preclude a subsequent federal court from entertaining exclusive federal securities claims on the basis of res judicata. As the Marrese court held, where a state court would give a prior state judgment such broad res judicata effect, then a federal court is required to follow suit. 470 U.S. at 379-81, 105 S.Ct. at 1331-32.[12] We need not address this question because the district court expressly ruled that the federal claims had been released as a part of the state court judgment. Grimes, 1993 WL 56032, at * 3, and that these claims were precluded by the collateral estoppel effect of this judgment, id. at *4-5.
 
 
 39
 As we previously indicated, we agree with the district court that the language of this broad release manifests an intent by the parties to settle all claims arising from the merger transaction. See supra note 10. In addition, we have determined that all class members, including Grimes and Holbrook, are constitutionally bound by the prior judgment. Therefore, the full faith and credit statute operates to bar a federal court from considering any claims arising from the merger transaction if a Delaware state court would find that the judgment precludes the relitigation of any issues conclusively determined in the state court proceeding.
 
 
 40
 As the district court found when it analyzed state law, Grimes, 1993 WL 56032, at * 4, Delaware follows the usual rule that a judgment in one case constitutes a final determination concerning questions of fact litigated by the parties. See E.B.R. Corp. v. PSL Air Lease Corp., 313 A.2d 893, 894 (Del.1973); Winkler v. Balentine, 254 A.2d 849, 851 (Del.1969); accord Nottingham Partners, 925 F.2d at 32. Since a state court would conclude that the plaintiffs are collaterally estopped from relitigating the factual issues of nondisclosure, adequacy of representation, and fairness of the settlement that they raise in this lawsuit, the district court correctly ruled that the federal defendants were entitled to summary judgment. In short, the full faith and credit statute requires the federal court to give collateral estoppel effect to the state court judgment. Since this judgment places the court's stamp of approval on a broad release of all claims arising from the merger transaction, including any exclusive federal claims, the subsequent federal court is precluded from entertaining a case involving claims arising from the same nucleus of operative facts.
 
 D.
 
 41
 While this rule of law may seem anomalous at first glance, it is widely recognized that courts without jurisdiction to hear certain claims have the power to release those claims as part of a judgment. See, e.g., Class Plaintiffs v. City of Seattle, 955 F.2d 1268, 1287-88 (9th Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 408, 121 L.Ed.2d 333 (1992) (a federal court may release not only claims alleged in the complaint, but also state claims arising from the same nucleus of operative facts over which the court would not have jurisdictional competency); TBK Partners Ltd. v. Western Union Corp., 675 F.2d 456, 460 (2d Cir.1982) (same); In re Corrugated Container Antitrust Litig., 643 F.2d 195, 221-22 (5th Cir.1981), cert. denied, 456 U.S. 998, 102 S.Ct. 2283, 73 L.Ed.2d 1294 (1982) (same). This rule of law serves the important policy interest of judicial economy by permitting parties to enter into comprehensive settlements that "prevent relitigation of settled questions at the core of a class action." TBK Partners, 675 F.2d at 460.
 
 
 42
 Nor is this rule of law limited to federal courts entering judgments that release state claims that they would not have jurisdictional competency to entertain in the first instance. We hold that as a matter of federal law a state court has the power to enter a settlement negotiated by the parties as a judgment which releases exclusive federal claims that the state court could not itself entertain. With this holding, we follow several other federal courts that have recognized the broad power of state courts to approve and enforce settlements which reflect the parties' intent to release all claims arising from a transaction regardless of whether the class action court has jurisdictional competency to hear those claims. See Nottingham Partners, 925 F.2d at 34; Abramson v. Pennwood Inv. Corp., 392 F.2d 759, 762 (2d Cir.1968). See also Sandler Assocs., L.P. v. BellSouth Corp., 818 F.Supp. 695, 704-05 (D.Del.1993), appeal filed, No. 93-7343 (3d Cir. May 12, 1993); Lowenschuss v. Resorts Int'l, No. 89-1071, 1989 WL 73254, 1989 U.S.Dist. LEXIS 7407, at * 20 n. 15 (E.D.Pa. June 29, 1989).
 
 
 43
 Despite the well established authority for this legal proposition, the federal plaintiffs urge this court to hold that the state court did not have power to enter such a broad release based on the rationale put forth by Judge Friendly in National Super Spuds, Inc. v. New York Mercantile Exch., 660 F.2d 9, 18-19 (2d Cir.1981). In National Super Spuds, the U.S. Court of Appeals for the Second Circuit ruled that a federal court was not precluded from entertaining a federal claim despite an earlier broad release entered into by the parties to a state court proceeding. Id. at 17-18. However, National Super Spuds is distinguishable from the case sub judice because the federal plaintiff brought claims based on unliquidated futures contracts, while the state court class was organized only to litigate claims based on futures contracts liquidated during the relevant time period. Id.
 
 
 44
 Thus, our holding today is not inconsistent with the holding of the National Super Spuds court that a state court class representative cannot release federal claims arising from a different factual predicate than that before the state court. Judge Friendly expressly limited the opinion to the facts before the court by recognizing that "a settlement could properly be framed so as to prevent class members from subsequently asserting claims relying on a legal theory different from that relied upon in the class action complaint but depending upon the very same set of facts." Id. at 18 n. 7. While National Super Spuds was "not such a case," id., the present one is.
 
 IV.
 
 45
 We conclude that the district court properly entered summary judgment in favor of the defendants because all of the elements of a dispositive release defense were present. As a member of the plaintiff class who owned Vitalink stock and tendered his shares, plaintiff Holbrook had sufficient contacts with the Delaware forum such that the Court of Chancery could exercise specific jurisdiction to adjudicate his stock ownership rights. Furthermore, the state court judgment releasing all claims arising from the merger transaction was entitled to full faith and credit by the district court even though the state court did not have jurisdictional competency to entertain the present exclusive federal claims. We will affirm the judgment of the district court. Each party will bear its own costs.
 
 
 46
 HUTCHINSON, Circuit Judge, dissenting.
 
 
 47
 I respectfully dissent from the Court's mandate insofar as it affirms the district court's dismissal of Holbrook's federal actions. I concur with the Court's holding that Grimes and other members of the non-opt-out plaintiff class, over whom the Delaware Court of Chancery had personal jurisdiction, are bound by the class representatives' general release of all of the class members' claims that arise out of the merger of Vitalink with Network, including claims under federal securities law, for material misrepresentations which the defendants may have made in connection with the merger and the stock subject to the tender offer. I think Holbrook is not bound because the courts of Delaware lacked personal jurisdiction over him. I reason as follows.
 
 I.
 A.
 
 48
 Holbrook is not a Delaware resident, he has not consented to jurisdiction and he was not given a chance to opt out. Nevertheless, in Part III.B. of its opinion, the Court holds that his tender of shares of stock he owned in a Delaware corporation meets International Shoe's due process test of minimum contacts. It concludes these tenuous contacts with Delaware permit a court of that state, sitting in equity, to exercise in personam jurisdiction over Holbrook as a member of a Rule 23(b)(1) or (b)(2) non-opt-out class. Because of its conclusion that the state court had personal jurisdiction over Holbrook, the Court goes on to hold that the class representatives' settlement of a state suit to enjoin the merger of Vitalink and Network on the theory that Vitalink's officers and directors deceitfully or fraudulently breached their common law fiduciary duties to the corporation or its shareholders binds Holbrook.
 
 
 49
 Finally, the Court holds that a non-resident who never consented to class representation in a state court is not only precluded from further equitable relief by a release of claims incorporated into the settlement decree but also from all legal actions for money damages, including actions Congress has entrusted to the exclusive jurisdiction of federal courts.
 
 
 50
 In doing so, the Court recognizes that due process prohibits the courts of any particular state from exercising personal jurisdiction over a non-resident absent minimum contacts. See International Shoe v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). I think it errs, however, in concluding that Holbrook's stock ownership, when coupled with his tender of stock in accord with the tender offer that he claims violated federal law, gives Delaware the "minimum contacts" which are necessary before a state court can exercise personal jurisdiction over non-resident, non-consenting members of a class that otherwise purports to include all the stockholders of one of that state's domestic corporations.
 
 
 51
 Under the Supreme Court's jurisprudence placing due process limitations on a court's exercise of jurisdiction, it is clear that the exercise of such jurisdiction must comport with "traditional notions of fair play and substantial justice." See International Shoe, 326 U.S. at 320, 66 S.Ct. at 160. Specifically, the Supreme Court has stated:
 
 
 52
 The Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful "contacts, ties, or relations." [ ] By requiring that individuals have "fair warning that a particular activity may subject [them] to the jurisdiction of a foreign sovereign," [ ] the Due Process Clause "gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit...."
 
 
 53
 Burger King Corp. v. Rudzewicz, 471 U.S. 462, 471-72, 105 S.Ct. 2174, 2181-82, 85 L.Ed.2d 528 (1985) (citations and footnote omitted). I believe that the Delaware court's exercise of jurisdiction over Holbrook does not comport with this standard.
 
 
 54
 In Shaffer v. Heitner, 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977), the Supreme Court extended International Shoe to all exercises of state court jurisdiction, including exercises of quasi in rem jurisdiction. Shaffer involved a shareholder's derivative action, filed in Delaware state court against officers and directors of a Delaware corporation, including some officers and directors who were non-residents of Delaware. Shaffer, 433 U.S. at 189-96, 97 S.Ct. at 2572-75. The Delaware court exercised quasi in rem jurisdiction over these nonresident defendants by sequestering their stock in a Delaware corporation. Id. at 196, 97 S.Ct. at 2575. The United States Supreme Court held that the non-resident officers' and directors' ownership of stock in a Delaware corporation did not give Delaware the minimum contacts due process required. Id. at 213-14, 97 S.Ct. at 2584-85. Accordingly, the Supreme Court decided Delaware's Chancery Court could not subject non-resident officers and directors who owned shares in a Delaware corporation to a sequestration procedure. Id. at 216-17, 97 S.Ct. at 2586-87. Justice Stevens specifically noted that "[o]ne who purchases shares of stock on the open market can hardly be expected to know that he has thereby become subject to suit in a forum remote from his residence and unrelated to the transaction." Id. at 218, 97 S.Ct. at 2587 (Stevens, J., concurring).
 
 
 55
 Despite the Supreme Court's holding in Shaffer, the Delaware Chancery Court, in Hynson v. Drummond Coal Co., 601 A.2d 570, 579 (Del.Ch.1991), concluded that ownership of stock in a Delaware corporation is a sufficient basis for a Delaware court to exercise jurisdiction over the corporation's stockholders. I believe that Hynson is inconsistent with Shaffer and that the Delaware Chancery Court's position that it could exercise, in this case, personal jurisdiction over absent class members who have not been given an opportunity to opt out solely because they own stock in a Delaware corporation runs afoul of the Due Process Clause of the Fourteenth Amendment to the Constitution. Because Hynson was not appealed, we do not have the benefit of the Delaware Supreme Court's view on this issue.
 
 
 56
 Shaffer is not the only case which has held, or implied, that ownership of stock in a domestic corporation is not enough of a contact to give the courts of the state of incorporation personal jurisdiction over the corporation's stockholders. Even when that ownership is coupled with other local contacts connected with the acquisition or disposition of a domestic corporation's stock, courts have held that they have no personal jurisdiction over nonresident stockholders. See Edwards v. Geosource, Inc., 473 So.2d 36, 37 (Fla.Dist.Ct.App.1985) (mere ownership of stock in Florida corporation, coupled with execution of promissory note to purchase the stock, insufficient contacts to confer personal jurisdiction); cf. Cannon Mfg. Co. v. Cudahy Packing Co., 267 U.S. 333, 336-38, 45 S.Ct. 250, 251-52, 69 L.Ed. 634 (1925) (activities of subsidiary corporation did not subject parent holding stock in subsidiary to local court's jurisdiction absent parent's control of subsidiary or other facts permitting corporate veil to be pierced). But see Gaudio v. Gaudio, 23 Conn.App. 287, 580 A.2d 1212, 1220 (1990) (dictum) (noting plaintiff's argument that mere ownership in stock was an insufficient contact "might be persuasive if the transaction at issue involved the relatively routine and anonymous purchase of publicly traded stock through a broker or agent" but that an express agreement to purchase stock could supply the necessary contact).
 
 
 57
 Shaffer shows this Court's decision not to rely solely on Holbrook's ownership of stock is wise. While I agree with the Court that in this case we are concerned with specific jurisdiction, I am unable to see how Holbrook's response to the tender offer he claims was misleading under the federal disclosure laws adds any material contact with Delaware or, alternately, supplies sufficient evidence of consent to personal jurisdiction to satisfy due process. Whether stock ownership coupled with a tender under the offer a plaintiff claims is misleading as a matter of federal law provides the minimum contacts due process requires seems to be a question of first impression on which I have uncovered no specific authority. The Court cites Hanson v. Denckla, 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958) and Carteret Savings Bank, FA v. Shushan, 954 F.2d 141, 146-48 (3d Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 61, 121 L.Ed.2d 29 (1992), in support of its proposition that the tender was a sufficient contact. I do not think these cases answer the question. Neither have anything to do with tender offers. See Hanson, 357 U.S. at 251-52, 78 S.Ct. at 1238-39 (Florida had no personal jurisdiction over Delaware trust when trustee later became domiciled in Florida because the trust company did not transact business there and none of the trust assets were held there); Carteret, 954 F.2d at 149-50 (when Louisiana attorney not only telephoned and corresponded with client's management in New Jersey but also traveled to New Jersey to meet with management concerning transaction in question, lawyer and his law firm had minimum contacts courts in New Jersey needed to exercise personal jurisdiction over defendant in claim for breach of duty in preparing contract). I do not think these cases support the Court's position. Though I am equally unable to cite authority directly on point, I believe the effect of depriving Holbrook of his exclusively federal securities claims which the Court's holding has done does not square with the federalism component I believe to be intertwined in the due process requirements concerning personal jurisdiction.[1]
 
 B.
 
 58
 The question thus becomes whether a lack of minimum contacts deprives a court-approved consent decree settling a Rule 23(b)(1) or (2) class action of any binding effect on non-resident, non-consenting members of a non-opt-out class. The Supreme Court has stated generally that International Shoe's test of "traditional notions of fair play and substantial justice" applies to all exercises of state court jurisdiction, and it has never explicitly held a court can exercise personal jurisdiction over absent unconsenting members of a plaintiff class if minimum contacts are lacking.
 
 
 59
 This general principle, however, is set out in cases involving jurisdiction over individual, as opposed to class, defendants. See, e.g., Burger King Corp., 471 U.S. at 471-72, 105 S.Ct. at 2181-82; World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 295, 100 S.Ct. 559, 566, 62 L.Ed.2d 490 (1980). Thus, some courts have relied on Hansberry v. Lee, 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940), to indicate that a court may bind unnamed members of a plaintiff class without personal jurisdiction over all of them. See Miner v. Gillette Co., 87 Ill.2d 7, 56 Ill.Dec. 886, 889, 428 N.E.2d 478, 481 (1981), cert. dismissed, 459 U.S. 86, 103 S.Ct. 484, 74 L.Ed.2d 249 (1982); Katz v. NVF Co., 119 Misc.2d 48, 462 N.Y.S.2d 975, 977 (1983), rev'd on other grounds, 100 A.D.2d 470, 473 N.Y.S.2d 786 (1984). These courts base this conclusion on dictum in Hansberry which says that a class action may be appropriate for "causes in which the number of those interested in the litigation is so great as to make difficult or impossible the joinder of all because some are not within the jurisdiction...." Hansberry, 311 U.S. at 41, 61 S.Ct. at 118. I think they overlook the teaching of International Shoe, decided after Hansberry.
 
 
 60
 Indeed, in Hansberry, the Court repeated the principle that "one is not bound by a judgment in personam in a litigation in which he is not designated as a party or to which he has not been made a party by service of process." Hansberry, 311 U.S. at 40, 61 S.Ct. at 117 (citing Pennoyer v. Neff, 95 U.S. 714, 24 L.Ed. 565 (1878)).[2] The Supreme Court went on to state that the considerations which induce a court to certify a class differ from those it must consider in deciding whether absent members of the class will be bound by the decree. Id., 311 U.S. at 42, 61 S.Ct. at 118. Perhaps foreshadowing International Shoe, it then said: "[T]here has been a failure of due process only in those cases where it cannot be said that the procedure adopted, fairly insures the protection of the interests of absent parties who are bound by it." Id.
 
 
 61
 No issue of personal jurisdiction was before the Court in Hansberry, and it seems to me a conclusion that a court may bind unnamed class members ignores Hansberry's distinction between the requirements for valid class actions and the limitations due process puts on their preclusive effect on absent, non-consenting class members. It is also in stark conflict with the Supreme Court's holding in Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985), that due process requires non-resident, non-consenting class members be given notice, an opportunity to be heard, and a chance to opt out. 472 U.S. at 812, 105 S.Ct. at 2974. Therefore, it does not seem to me that Hansberry's dictum stating a class suit "may bind members of the class or those represented who were not made parties to it" announces an exception to the general principle that a party is not bound by a court's order unless it has personal jurisdiction over him. Hansberry, 311 U.S. at 41, 61 S.Ct. at 118.
 
 
 62
 Many cases which state or seem to imply that personal jurisdiction can be exercised over absent members of a plaintiff "class" without minimum contacts are "common fund" cases in which the court entertaining the action had jurisdiction over nonresident members. Jurisdiction there is present because the plaintiffs have a property interest in the fund or alternately because the court had in rem or quasi in rem jurisdiction over the fund. See, e.g., Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950); Supreme Tribe of Ben-Hur v. Cauble, 255 U.S. 356, 41 S.Ct. 338, 65 L.Ed. 673 (1921), overruled on other grounds, Toucey v. New York Life Ins. Co., 314 U.S. 118, 62 S.Ct. 139, 86 L.Ed. 100 (1941); Hartford Life Ins. Co. v. Ibs, 237 U.S. 662, 35 S.Ct. 692, 59 L.Ed. 1165 (1915). See also generally Barbara A. Winters, Jurisdiction Over Unnamed Plaintiffs in Multistate Class Actions, 73 Calif.L.Rev. 181 (1985). The case now before us is not a typical limited fund or common interest case. It has its genesis in its state, as well as federal, version of what Holbrook alleges is the defendants' fraud or deceit in connection with a merger the state court plaintiffs unsuccessfully sought to enjoin. In any event, I believe the procedural rules governing class actions in all courts, state and federal, are subject to due process under either the Fifth Amendment or the Fourteenth Amendment, as it applies to the states.[3]
 
 
 63
 The Shutts case arose when a class of leaseholders brought suit over royalty payments in Kansas state court. Almost all of the plaintiffs and leases lacked any relationship to Kansas. The class notification informed all members of the pendency of a class action that could affect them and provided them with the opportunity to opt out of the class. Shutts, 472 U.S. at 799-801, 105 S.Ct. at 2967-69. In upholding the class action, the Supreme Court specifically stated that an absent member of a plaintiff class who lacks minimum contacts with the state whose court is entertaining a class action cannot be bound by a judgment entered in it unless the plaintiff has received "at a minimum ... an opportunity to remove himself from the class by executing and returning an 'opt out' or 'request for exclusion' form to the court." Id. at 812, 105 S.Ct. at 2974.
 
 
 64
 In In re Drexel Burnham Lambert Group, Inc., 960 F.2d 285 (2d Cir.1992), cert. dismissed sub nom. Hart Holding Co. v. Drexel Burnham Lambert Group, --- U.S. ----, 113 S.Ct. 1070, 122 L.Ed.2d 497 (1993), the court of appeals decided that members of a plaintiff class who had filed federal securities claims before Drexel filed for bankruptcy could be denied an opportunity to opt out of a settlement only because all of the class members had consented to the bankruptcy court's jurisdiction when they filed proofs of claim in the defendant's bankruptcy proceeding. Id. at 292.[4] In reaching this conclusion, the court of appeals noted:
 
 
 65
 We are not unaware of the Supreme Court's statement in Phillips Petroleum Co. v. Shutts, 472 U.S. 797 [105 S.Ct. 2965, 86 L.Ed.2d 628] (1985), that "due process requires at a minimum that an absent plaintiff be provided with an opportunity to remove himself from the class by executing and returning an 'opt out' or 'request for exclusion' form to the court." Id. at 812 [105 S.Ct. at 2974]. Shutts mandates that a plaintiff be permitted to opt out of a proposed class when the court does not have personal jurisdiction over the plaintiff. Id. at 811-12 [105 S.Ct. at 2974-75].
 
 
 66
 In re Drexel Burnham Lambert, 960 F.2d at 292 (parallel citations omitted).
 
 
 67
 Shutts has been the subject of much discussion by both courts and commentators. In In re A.H. Robins Co., 880 F.2d 709, 744 (4th Cir.), cert. denied sub nom., Anderson v. Aetna Cas. & Sur. Co., 493 U.S. 959, 110 S.Ct. 377, 107 L.Ed.2d 362 (1989), another court of appeals, analyzing Shutts' effect on mandatory non-opt-out class certification (i.e., Rule 23(b)(1) and (2) classes), noted that some commentators view Shutts as holding " 'that a state court can bind absent class plaintiffs to a judgment for money damages (only) if it provides the absent parties the minimal procedural protections of adequate representation, notice of the action, and an opportunity to opt out of the litigation.' " Id.[5] The court also noted a commentary which concludes " '[t]here is no neat and logical means of resolving the question whether mandatory actions survive Shutts.' " In re A.H. Robins Co., 880 F.2d at 744 (quoting Arthur R. Miller & David Crump, Jurisdiction and Choice of Law in Multistate Class Actions After Phillips Petroleum Co. v. Shutts, 96 Yale L.J. 1, 52 (1986)).
 
 
 68
 In re A.H. Robins Co. was a Rule 23(b)(1) action. There, the court referred to commentary concerning the binding effect of Rule 23(b)(2) class actions on non-residents who were not given a chance to opt out. Quoting this commentary, the court of appeals said:
 
 
 69
 The problem of the Rule 23(b)(2) class action is that binding absent class members without giving them notice and the right to opt out violates due process. The problem is clear under the apparently applicable standards of Phillips Petroleum Co. v. Shutts. Indeed, the only way in which the binding Rule 23(b)(2) class action might be seen not to be a violation of due process is if one follows Matthews v. Eldridge [424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) ] and weighs the harm to the interests of absentees with the cost of the alternative safeguard of notice and the right to opt out.
 
 
 70
 In re A.H. Robins Co., 880 F.2d at 744-45[6] (quoting Mark Weber, Preclusion and Procedural Due Process in Rule 23(b)(2) Class Actions, 21 U.Mich.J.L.Ref. 347, 394 (1988) (footnote omitted in original)).[7]
 
 
 71
 Shutts, on its facts, was a plaintiff class's action for money damages, and the Supreme Court expressly reserved the question whether its holding applied to cases in which a plaintiff class sought equitable relief. Shutts, 472 U.S. at 811 n. 3, 105 S.Ct. at 2974 n. 3. Accordingly, some commentators and courts have concluded that Shutts has no application to cases in which a plaintiff class seeks relief that is primarily equitable in nature. See, e.g., White v. National Football League, 822 F.Supp. 1389, 1410-11 (D.Minn.1993) (reading Shutts to require a chance to opt out only in actions that concern claims "wholly or predominantly for money judgments" and not claims in which injunctive relief is the predominate relief sought) (citing Shutts, 472 U.S. at 811-12 & n. 3, 105 S.Ct. at 2974-75 & n. 3); see also In re Jackson Lockdown/MCO Cases, 107 F.R.D. 703, 713-14 (E.D.Mich.1985).
 
 
 72
 If this conclusion is correct in its broad sense, a chance to opt out is not required when a class is properly certified as a Rule 23(b)(1) or (2) class. A brief excursion into the genesis of class actions and their present division among Rule 23(b)(1), (2) and (3) may help explain, but not necessarily justify, this conclusion.[8] Our class actions originated in the English bill of peace. They were originally cognizable only in equity, see Charles A. Wright et al., 7A Federal Practice & Procedure Civil 2d (hereinafter "Federal Practice & Procedure "), Sec. 1751, at 7-10, because the procedural tools available in the law courts were not adequate to protect the rights of unknown parties. See id. Sec. 1751, at 11. Because of its utility, the class suit in equity came to this country with the common law and was eventually incorporated into numerous state procedural codes. "The obvious advantage of the representative suit was that it was far cheaper and more convenient to maintain a single proceeding in equity than to adjudicate the controversy in piecemeal fashion by multiple actions at law." Id. Sec. 1751, at 8.
 
 
 73
 As the modern class action evolved from this background, its efficiency in disposing of claims involving common issues affecting many persons resulted in an expansion of its use that took it beyond the confines of the old bill of peace. Ultimately, it was extended to actions at law. See id. Sec. 1751, at 11. Since then, class actions have been divided into three parts. They were originally referred to as "spurious," "hybrid" and "true." Under the Federal Rules of Civil Procedure, these terms were abandoned in the 1966 amendments to our rules. See generally 7A Federal Practice & Procedure Sec. 1752 at 16. The "spurious" class action covered separate claims with common questions of law or fact. It loosely resembled today's Rule 21(b)(3) action. In a spurious class action, the class remedy was dependent solely on multiplicity or numerosity of parties. "True" class actions involved joint or common interests. They arose naturally out of the old bill of peace. "Hybrid" actions involved claims against limited pools of property or cash that bear some analogy to estates or trusts of all kinds.[9] There, equity's long experience with the administration of estates commonly requiring resolution of competing claims to a res among various kinds of creditors and classes of beneficiaries provided an additional underpinning for the remedy of class relief with its origin in equity.
 
 
 74
 Members of true classes were wholly bound by res judicata, but hybrid class members were bound only to the extent that their claims concerned the fund before the court. See Miller & Crump, supra, at 39-40 & n. 276. The 1966 amendments to Federal Rule 23(b)(1) and 23(b)(2) brought most of the actions that would have been labelled true or hybrid under the Rule's original terminology within Rule 23(b)(1) or (2). Id. at 40 & n. 277. As I have stated, others involving only common issues affecting many persons, generally fall under Rule 23(b)(3).
 
 
 75
 Both Federal Rule of Civil Procedure 23, and Delaware's Rule governing class actions provide in a class action maintained under subdivision (b)(3) that notice advising class members of their right to opt out of the class must be given. See Fed.R.Civ.P. 23(c)(2); Del.Chanc.R.P. 23(c)(2). By negative implication, however, this right to notice and a chance to opt out has been thought not to apply to class actions maintained under subdivisions (b)(1) and (b)(2). Thus, Rule 23(b)(1) & (2) class actions are often referred to as mandatory class actions.
 
 
 76
 Though Shutts was not a mandatory class action, i.e., one certified under Rule 23(b)(1) or (b)(2) and thus left the due process concerns implicated by mandatory classes unresolved, it did not limit its discussion of due process and its requirement of personal jurisdiction to Rule 23(b)(3) classes. Accordingly, Miller and Crump in their commentary have concluded that the right to opt out is a fundamental due process requirement which conflicts with the notion of a mandatory non-opt-out class that has developed, somewhat insensibly, under Rule 23(b)(1) & (2). In what may perhaps appear to be a bit of semantic overstatement, they say: "There can be no 'mandatory class' if the members have the constitutional right to opt out." Miller & Crump, supra, at 39 (single quotes added). Of course, it is clear, even under Shutts, that a court can deny a class member a right to opt out if either the member or the object of the action has sufficient contact with the forum, just as any absent person can be joined involuntarily as a defendant and later discover that his interest in a particular res has been affected by orders issued in actions in rem or quasi in rem. With these exceptions, Miller and Crump suggest that Shutts "prohibit[s] mandatory class certification completely [because that] result seems supported by the unconditional statement of the right to opt out in Shutts." Id. at 54. Where a member of a plaintiff class lacks the minimum contacts that are necessary to give the courts of a particular state personal jurisdiction over him, I too believe Shutts implies his involuntary inclusion in a mandatory class certified under Rule 23(b)(1) or (b)(2) should be prohibited unless he is given notice and a chance to opt out.
 
 
 77
 Recently, in Carlough v. Amchem Products, Inc., 10 F.3d 189, 199 (3d Cir.1993), we stated "it would offend the Fifth Amendment's guarantee of due process for a federal court to enjoin an absentee class member whose minimum contacts with the forum have not been established or, in lieu of minimum contacts, who has not consented to the court's jurisdiction, explicitly or inferentially."
 
 
 78
 Moreover, In re Real Estate Title & Settlement Services Antitrust Litigation, 869 F.2d 760, 769 (3d Cir.), cert. denied sub nom. Chicago Title Insurance Co. v. Tucson Unified School District, 493 U.S. 821, 110 S.Ct. 77, 107 L.Ed.2d 44 (1989), also contains dicta supporting my conclusion that any class member lacking minimum contacts with the forum entertaining the class action must be given a chance to opt out. It involved a federal injunction of a state action for violations of state antitrust law on the basis of a prior class action settlement in the district court. We referred to the fact that the classes were certified pursuant to Federal Rule 23(b)(1) and (b)(2) making them "types of class actions that do not provide the right to opt out." Id. at 763. We went on to hold that a federal district court could not enjoin a state court action for damages. We stated that a member of a plaintiff class who lacks minimum contacts must have a chance to opt out before a court can exercise personal jurisdiction over him:
 
 
 79
 [I]f the member has not been given the opportunity to opt out in a class action involving both important injunctive relief and damage claims, the member must either have minimum contacts with the forum or consent to jurisdiction in order to be enjoined by the district court that entertained the class action.
 
 
 80
 Id. at 769 (emphasis added and footnote omitted).
 
 
 81
 Despite these dictum, the question whether due process requires either minimum contacts or an opportunity to opt out in a case like this has heretofore been an open question in this Court. See In re Real Estate Title & Settlement Servs. Antitrust Litig., 869 F.2d at 768-69 ("We need not reach the issue, left open by Shutts ... whether an absent plaintiff can be bound to the judgment in a hybrid (damage and injunctive) class action if it was not afforded the opportunity to opt out.") (emphasis added & citation omitted).
 
 
 82
 In this case, I think the issue is squarely presented. Here, the plaintiff class settled a state case in which it had sought equitable relief in the form of an order enjoining the proposed merger. Alternately, it sought compensatory and rescissionary damages if injunctive relief proved inappropriate or untimely.
 
 
 83
 I do not think the distinction between cases seeking equitable relief as opposed to money damages has any logical relation either to Fourteenth Amendment or Fifth Amendment concepts of due process's requirement of personal jurisdiction. Rather, it seems to me only a vestigial reminder of the different ways in which the law relating to joinder of parties evolved in courts of equity as opposed to courts of law. See supra at 1568.
 
 
 84
 Accordingly, I am unable to conclude that the arcane distinction between equitable jurisdiction based on multiplicity of parties (Rule 23(b)(3)) and equitable jurisdiction in cases involving multiple parties where multiplicity was coupled with an independent basis of equitable jurisdiction, e.g., injunction, interpleader, etc. (Rule 23(b)(1) & (2)) affects the restrictions due process places on a court's exercise of jurisdiction in personam.
 
 
 85
 Thus, if a decision on money damages is to bind a non-resident, non-consenting member of a class, I think the Constitution requires an opportunity to opt out in the absence of minimum contacts whether the class action has as its basis only a common question involving many parties or an independent basis for equitable intervention.
 
 
 86
 Some courts and scholars contend, however, that giving non-consenting, non-resident class members who lack minimum contacts with the forum in which the class action is brought a right to opt out is likely to deprive class actions of their efficiency. The magnitude of that concern has been seriously questioned, however. See Miller & Crump, supra, at 37. In many multistate class actions, contacts will be adequate to establish jurisdiction over the person of all class members. They will almost always be so when the action concerns a joint interest in property or a common fund, or where the class members have engaged in activities in the forum. See id. Moreover, the efficiency of class actions should be weighed against the equitable and due process concerns implicated by the potential res judicata effect on non-resident and absent plaintiffs. See supra n. 5. Professors Miller & Crump illustrate this problem as follows: "The rights of nonresident class members can be appreciated by considering ... a class action ... that is settled for much less than some class members think is reasonable." Miller & Crump, supra, at 16-17. In the case now before us, it is not too hard to understand how a non-consenting class member could think a settlement that puts no money in his pocket but takes away his right to seek damages under federal laws entrusting his non-disclosure claims exclusively to federal courts is unfair.
 
 II.
 
 87
 Thus, here the state court's attempt to release federal claims that Congress has placed in the exclusive jurisdiction of federal courts under the interstate commerce power Article I, Section 8, Clause 3 of the Constitution grants Congress, compounds the difficulties that arise if the Delaware decree binds Holbrook. It has been noted that the requirement of minimum contacts has as one of its elements a respect for the individual sovereignty of the various states and their dual sovereignty with the national government. That mutual respect is said to be inherent in our federalism. See World-Wide Volkswagen, 444 U.S. 286, 293-94, 100 S.Ct. 559, 565-66, 62 L.Ed.2d 490 (1980); see also Miller & Crump, supra, at 32. Thus, in World-Wide Volkswagen, 444 U.S. at 291-94, 100 S.Ct. at 564-66, the Supreme Court, concerned with upholding shared state interests, reaffirmed its commitment to the minimum contacts and fair play and substantial justice test of International Shoe. The restriction the Fourteenth Amendment imposes on state courts' exercise of personal jurisdiction serves not only the interest of the absent plaintiff but also acts in the interest of federalism. It ensures that states do not reach out beyond the limits of their power. World-Wide Volkswagen, 444 U.S. at 292-93, 100 S.Ct. at 564-65; but see Shutts, 472 U.S. at 807, 105 S.Ct. at 2972 (endorsing approach of Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 702-03 & n. 10, 102 S.Ct. 2099, 2104-05 & n. 10, 72 L.Ed.2d 492 (1982), and stating "the requirement that a court have personal jurisdiction comes from the Due Process Clause's protection of the defendant's personal liberty interest and ... the requirement 'represents a restriction on judicial power not as a matter of sovereignty, but as a matter of individual liberty.' ") (footnote omitted in original)); cf. Miller & Crump, supra, at 33 (indicating that approach of Shutts adopting limited role for federalism leaves open the question whether there are valid interests that will be left unprotected by the abandonment of the World-Wide Volkswagen approach). I do not think those concerns are present here and, in any event, it would be my view that the liberty interest the due process clause protects is complemented by the common federal interest that is the concern of the commerce clause.
 
 
 88
 If the residual sovereignty of the individual states is part of the rationale behind the restrictions minimum contacts place on the state courts' exercise of personal jurisdiction over each other's citizens or residents, then it also seems to me that respect for the sovereignty of the federal government in areas in which the Constitution grants it power should also affect the power of a state to preclude the exclusively federal actions of persons who lack minimum contacts with that state or the cause it is hearing.[10]
 
 
 89
 Use of a state's mandatory class action to bar later actions by non-consenting, non-residents under the Securities Exchange Act of 1934 and the Williams Act thus seems to me to infringe on the mutual respect of the states and the federal government for each others' sovereignty that our federalism requires. See Radzanower v. Touche Ross & Co., 426 U.S. 148, 157-59 & n. 15, 96 S.Ct. 1989, 1994-96 & n. 15, 48 L.Ed.2d 540 (1976); see also 15 U.S.C.A. Sec. 78aa (West Supp.1993). Balkanization of the national system regulating interstate commerce in corporate securities is foreseeable if each state can subject any non-resident stockholder of one of its domestic corporations to decrees which settle disputes about state corporate law by taking from non-consenting, non-resident shareholders remedies they may have under federal securities law against those who control the corporation.[11]
 
 III.
 
 90
 For all these reasons, I think that state courts have no power to bind non-resident shareholders, who do not consent to state jurisdiction, to state court settlements of disputes over local corporate law which include waivers of their federal claims. I would conclude that Holbrook's ownership of stock in a Delaware corporation and his tender pursuant to the tender offer that he claims failed to meet federal disclosure standards did not, consistent with due process, give the Delaware Court of Chancery in personam jurisdiction over him as a non-resident, non-consenting member of a non-opt-out class certified under Delaware Chancery Rule 23(b)(1) and (b)(2). That being the case, I do not think he is bound by the class representative's release of his federal securities law claims. I would therefore reverse the district court's order granting Vitalink's motion for summary judgment based on claim or issue preclusion arising out of the release of the parties the state court included in the consent decree insofar as that order concerns Holbrook.[12] I would hold instead that Holbrook was not subject to the in personam jurisdiction of Delaware's Court of Chancery and that its attempt to bind him without his consent was a denial of due process. I would then enter an order remanding this case to the district court for further proceedings on Holbrook's claims under the federal law that regulates the sale and transfer of corporate securities.
 
 SUR PETITION FOR REHEARING
 April 6, 1994
 
 91
 Before: SLOVITER, Chief Judge; BECKER, STAPLETON, MANSMANN, GREENBERG, HUTCHINSON, SCIRICA, COWEN, NYGAARD, ALITO, ROTH, and LEWIS, Circuit Judges.
 
 
 92
 The petition for rehearing filed by appellants having been submitted to the judges who participated in the decision of this court and to all the other available circuit judges of the circuit in regular active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular active service not having voted for rehearing by the court in banc, the petition for rehearing is denied.
 
 
 93
 Judge HUTCHINSON would have granted rehearing in banc.
 
 
 
 [1]
 The language of the settlement and release agreement, which is vital to the disposition of this case, is set out in full below:
 NOW, THEREFORE, IT IS STIPULATED AND AGREED, subject to the approval of the Court of Chancery, pursuant to Rule 23 of the Rules of the Court of Chancery, that the Consolidated Action shall be dismissed on the merits with prejudice as to all the defendants and the Defendants' Affiliates ... and against the plaintiffs and all other members of the Class without costs, except as provided in the Stipulation. All claims, rights, causes of action, suits, matters and issues, known or unknown, that arise now or hereafter out of, or that relate to, or that are, were or could have been asserted in connection with, Vitalink's and N[etwork's] employment agreements, change of control agreements, stock arrangements, and similar arrangements with Vitalink's employees, the Stock Option Agreement, N[etwork's] proposals to acquire Vitalink's stock ..., the disclosures made in the Schedule 14D-9, the Offer and the Merger, or any matters, transactions or occurrences referred to in the Complaint, or any other complaint in the Consolidated Action, or in any complaint in the California Actions, or any public statements, announcements or other activities relating to any of the foregoing, or the Settlement ..., by any member of the Class or by Vitalink, either directly, individually, derivatively, representatively or in any other capacity against any of the defendants in the Consolidated Action, their respective present or former officers, directors, stockholders, agents, employees, attorneys, representatives, advisors, investment bankers ..., commercial bankers, accountants, insurers, trustees, parents, affiliates, subsidiaries ..., directors and officers of such parents, affiliates and subsidiaries, general and limited partners, heirs, executors, personal representatives, estates, administrators, successors and assigns ... shall be compromised, settled, released and discharged subject to [certain terms and conditions summarized in the text].
 App. at 41-43.
 
 
 [2]
 This rule is virtually identical to Federal Rule of Civil Procedure 23(b)(1) and (2)
 
 
 [3]
 Title 15 U.S.C. Sec. 78aa provides in relevant part that "[t]he district courts of the United States ... shall have exclusive jurisdiction of violations of this chapter ..., and of all suits in equity and actions at law brought to enforce any liability or duty created by this chapter." Id. (emphasis added)
 
 
 [4]
 "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State." U.S. Const. art. IV, Sec. 1. Congress has extended the reach of the Full Faith and Credit Clause to require federal courts to uphold the judgments of state courts. 28 U.S.C. Sec. 1738 (1988). The full faith and credit statute provides that state court judgments "shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken." Id
 
 
 [5]
 Plaintiff Grimes does not contest that the Delaware Court of Chancery had personal jurisdiction over him as he appeared at the settlement hearing to litigate his objections
 
 
 [6]
 The state of Delaware is the situs of ownership of all stock in Delaware corporations. Del.Code Ann. tit. 8, Sec. 169 (1991)
 
 
 [7]
 We need not articulate whether we agree or disagree with most of what Judge Hutchinson has written in dissent because his opinion focuses on an issue that is beyond the scope of this case, namely whether it is constitutional for a court to bind a non-resident, non-consenting member of a non-opt-out class who has insufficient contacts with the forum. In light of our analysis as set forth above, we hold that Holbrook had sufficient contacts with the Delaware forum to be bound by the settlement agreement and judgment entered into on behalf of the class plaintiffs by the Delaware Court of Chancery. In addressing this holding, Judge Hutchinson expresses without analysis that he fails to see why Holbrook's affirmative act of tendering his shares to the Delaware corporation provides a further, sufficient contact with the Delaware forum so that the Court of Chancery could exercise specific jurisdiction over him
 
 
 [8]
 We recognize that in Shutts the Supreme Court addressed the minimal due process requirements to bind absent members of a plaintiff class who had an opportunity to opt out. Id. at 812, 105 S.Ct. at 2974. The Court described the class action device as one that protects the interests of absent plaintiffs through court inquiry into the common nature of all claims, the adequacy of representation, proper jurisdiction over the class, as well as a judicial determination of the fairness and adequacy of any proposed settlement agreed upon by the parties. Id. at 809-10, 105 S.Ct. at 2973. Although the present case involves a class action in which the absent plaintiffs were not given the additional procedural protection of an opportunity to opt out, we conclude that the due process protections as articulated in Shutts are sufficient to bind absent class members who had sufficient minimum contacts with the forum
 
 
 [9]
 The class notice contained a section entitled "DISMISSAL OF THE CONSOLIDATED ACTION AND RELEASE OF CLAIMS." App. at 533-34. This section stated in relevant part:
 All claims, rights, causes of action, suits, matters and issues, known or unknown, that arise now or hereafter out of, or that relate to, or that are, were or could have been asserted in connection with ... N[etwork's] proposals to acquire Vitalink stock ..., the disclosures made in the Schedule 14D-9, the Offer and the Merger, ..., by any member of the Class ... shall be compromised, settled, released and discharged.
 Id. Holbrook does not contend that he failed to receive this written notification.
 
 
 [10]
 The language contained in the release negotiated by the parties was very broad in scope, see supra note 1, and manifests an intent to settle all disputes that did or might arise out of the merger transaction. Consistent with the reading of the district court, see Grimes, 1993 WL 56032, at * 3, we interpret the settlement agreement to release all potential causes of action, even those like the present claims that can only be brought in federal court. See, e.g., Erie Telecommunications, Inc. v. City of Erie, Pa., 853 F.2d 1084, 1097 (3d Cir.1988) (broad language of a release "was obviously meant to put an end to all disputes ... arising out of" a franchise agreement transaction)
 "Under Delaware law, even a provision that releases 'any matter related to any of the acts or transactions described in the complaints in the said actions' will not be struck down as too general." Nottingham Partners, 925 F.2d at 33 n. 3 (quoting Rutman v. Kaminsky, 226 A.2d 122, 126 (Del.1967)). Thus, as the Nottingham Partners court found, "breadth is not a problem." 925 F.2d at 33 n. 3.
 
 
 [11]
 The district court stated: "Grimes argued that defendants had breached their duty of care in approving the offer and merger, and breached their duty of candor under Delaware law and federal securities laws." Id. (emphasis added). Although Grimes and Holbrook have not specifically argued that this factual finding is clearly erroneous, we have reviewed it and find it amply supported by the record. See In re Vitalink, [1991-92 Transfer Binder] Fed.Sec.L.Rep. (CCH) p 96,585, at 92,743, 1991 WL 238816 (Del.Ch. Nov. 8, 1991) ("The objectors argue that the Board failed to satisfy their duty of candor under Delaware law and their duty not to make material misrepresentations in the offering documents under federal law.")
 
 
 [12]
 The Supreme Court recognized that "a state court will not have occasion to address the specific question whether a state judgment has issue or claim preclusive effect in a later action that can be brought only in federal court." Id. at 381-82, 105 S.Ct. at 1332. This is necessarily so because a state court would not possess subject matter jurisdiction to entertain such a case in the first instance. We note, however, that a state court might need to address this issue as a collateral matter to determine the merits of an underlying legal claim such as attorney malpractice, or to determine the rights of certain parties in a state receivership proceeding. Such an inquiry by a state court of competent jurisdiction would be rare indeed. To the limited extent the Delaware courts have addressed this question, they recognize that the parties to a fair and procedurally sufficient global settlement "are bound by the release or the doctrine of issue preclusion." In re MCA, Inc., 598 A.2d 687, 691 (Del.Ch.1991)
 
 
 [1]
 See infra pp. 1572-73 for a discussion of the impact of federalism
 
 
 [2]
 Pennoyer 's so-called iron fence theory of territorial jurisdiction was expressly superseded by International Shoe's more flexible due process test. See International Shoe, 326 U.S. at 316, 66 S.Ct. at 158
 
 
 [3]
 Similar problems of personal jurisdiction arose as interpleader evolved in the United States. There, in an effort to avoid the problem of personal jurisdiction that accompanies a federal system of dual state and national sovereignty, parties to claims against insurance companies, entities that commonly face conflicting claims to a single fund, sought from the one side to attach the obligation or from the other to pay it into court in order to create a res whose ownership could be litigated without a need for personal jurisdiction. In one of these cases, on appeal from this Court, the Supreme Court rejected such efforts to avoid the requirement of in personam jurisdiction. New York Life Ins. Co. v. Dunlevy, 241 U.S. 518, 522, 36 S.Ct. 613, 614, 60 L.Ed. 1140 (1916). Congress then attempted to solve the problem of personal jurisdiction by enacting the Federal Interpleader Act, now codified at 28 U.S.C.A. Secs. 1335, 1397, 2361 (West 1993). It permits nationwide service of process in actions in interpleader. 28 U.S.C.A. Sec. 2361
 
 
 [4]
 Cf. Doumani v. Casino Control Comm'n, 614 F.Supp. 1465, 1471-73 (D.N.J.1985) (New Jersey Casino Commission had in personam jurisdiction over nonresident shareholders of New Jersey casino corporation only because shareholders' substantial stock interest gave them ability to significantly affect casino operation in New Jersey. Jurisdictional objection arguably waived.)
 
 
 [5]
 Quoting Note, Phillips Petroleum Company v. Shutts: Procedural Due Process and Absent Class Members: Minimum Contacts Is Out--Is Individual Notice In?, 13 Hastings Const. L.Q. 817, 821 (1986); Note, Phillips Petroleum Company v. Shutts: Multistate Plaintiff Class Actions: A Definite Forum, But Is It Proper?, 19 John Marshall L.Rev. 483, 485 (1986)
 
 
 [6]
 For an analogous solution proposing factors for a balancing test, see Miller & Crump, supra, at 55-56. They propose a four factor balancing test to determine the propriety of mandatory class certification after Shutts. The factors they would consider are: (1) efficiency, i.e., the economies of scale that can be achieved in a class action; (2) equity concerns, i.e., whether some plaintiffs will be unfairly harmed if other plaintiffs litigate first and whether defendants may be subjected to multiple liability, such as is present in the mass tort cases by virtue of punitive damages; (3) the concern about distant forum abuse; and (4) the interest in individualized control. Id
 
 
 [7]
 The court of appeals in In re A.H. Robins Co., after extensively discussing Shutts' impact on actions for money damages and recognizing that even "if [Shutts is] taken as requiring an opt-out provision in any class certification," did not reach or decide the issue of jurisdiction because the Trust Plan did include an implied chance to opt out. In re A.H. Robins Co., 880 F.2d at 745 (emphasis added)
 
 
 [8]
 The text of Delaware Chancery Rule 23 is the same as that of Federal Rule of Civil Procedure 23. Both jurisdictions recognize non-opt-out classes under (b)(1) and (b)(2). Cf. Fed.R.Civ.P. 23(b)(1), (b)(2); In re Joint Eastern & Southern District Asbestos Litig., 982 F.2d 721, 739 (2d Cir.1992) (mandatory non-opt-out class under Rule 23(b)(1)(B) in action seeking equitable distribution of res of trust established pursuant to confirmed Chapter 11 Plan), opinion modified on reh'g, 993 F.2d 7 (2d Cir.1993). I note that Wright and Miller, in discussing antitrust and securities fraud actions including those for misrepresentation, generally refer only to Federal Rule 23(b)(3), not (b)(1) or (b)(2), as a vehicle for the class action suit. See Charles A. Wright et al., 7B Federal Practice & Procedure Civil 2d (hereinafter "Federal Practice & Procedure" ) Sec. 1781 at 4-5, 33; id. Sec. 1778 at 529-33 & n. 14. Thus, it is not clear to me that this case involves a non-opt out class
 
 
 [9]
 Cf. Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950) (involving question of due process notice requirement in judicial settlement of trust fund, where trust company sought binding settlement over all beneficiaries of the trust on the sole basis of notice by publication)
 
 
 [10]
 Conventional notions of express or implied preemption were never presented here either in the district court or this Court. Therefore, I do not believe it would be appropriate to consider directly any actual or potential conflict between Delaware Rule 23(b)(2) and the Securities Exchange Act or the Williams Act
 
 
 [11]
 The parties have cited only two courts of appeals' cases that have addressed a state court's power to relinquish federal rights through approval of a class action settlement. See Nottingham Partners v. Trans-Lux Corp., 925 F.2d 29, 33-34 (1st Cir.1991); Abramson v. Pennwood Investment Corp., 392 F.2d 759, 762 (2d Cir.1968). Abramson was a federal stockholders derivative action that was barred because the corporation had released all related claims in a state court settlement. 392 F.2d at 760. Because Abramson was a derivative action, as opposed to a representative suit, the claims released belonged to the corporation and there should be little doubt about a corporation's ability to release its own claims. See National Super Spuds, Inc. v. New York Mercantile Exch., 660 F.2d 9, 18-19 (2d Cir.1981). This case is a representative action, not a derivative action. As such, it is distinguishable
 TBK Partners, Ltd. v. Western Union Corp., 675 F.2d 456 (2d Cir.1982), the other case cited by the parties, is also distinguishable. It concerned a settlement of a federal action that released defendants from all claims the plaintiff class might assert in a state appraisal proceeding. The objectors in TBK Partners never challenged the district court's certification of the class as a non-opt-out class. Thus, the court expressly reserved that question, stating "[w]e therefore do not consider the case of a release of claims of members of a class that had been improperly certified as a non-opt-out class." Id. at 460 n. 4; see also In re Real Estate Title & Settlement Servs. Litig., 869 F.2d 760, 770 (3d Cir.), cert. denied, 493 U.S. 821, 110 S.Ct. 77, 107 L.Ed.2d 44 (1989) (assuming that federal court in properly certified Rule 23(b)(1) and (2) class action could validly approve release of state claims). Cf. Nottingham Partners, 925 F.2d at 31, 34 (Delaware court had approved settlement of a class action including release of federal claims, but Nottingham had already unsuccessfully litigated its inclusion in a non-opt-out class in the Delaware proceedings).
 
 
 [12]
 Though our opinions in the case concern the rights of an absent plaintiff, we should not ignore the problems a defendant or defendants could face if a judgment or decree favorable to the plaintiffs binds the defendants but also permits non-consenting, non-resident plaintiffs to seek additional relief. One way to reduce that problem is to refuse to give non-consenting members of a plaintiff class the benefit of issue preclusion