## In re ESTATE PARTNERS, LTD., Debtors.

Estate Partners, Ltd., Plaintiff,

v.

James A. Budzak, M.D., Constance Budzak, Lawrence A. Collins, M.D., Judith S. Collins, David P. Connolly, M.D., Joanne P. Connolly, Marshall S. Levy, M.D., Lois G. Levy, Richard J. Panicco, M.D., Patricia Panicco, Mohan S. Phanse, M.D., Terence W. Starz, M.D., Joanne H. Starz, Fred Berkowitz, M.D., Lynne Berkowitz, Subramoniam Joyakumar, M.D., Celia Jayakumar, Robert S. Jones, Jr., Sharon Jones, Paul W. Kerber, Donna L. Kerber, Ramesh C. Khurana, Saroj B. Khurana, Ernest Medwig, Nancy J. Medwig, Stephen R. Nohowel, Vincent F. Plano, M.D., Sherry R. Plano, Robert N. Pursell, M.D., Carol S. Pursell, M.D., James L. Putt, Edmond C. Watters, Comley C. Watters, Donald W. Wright, Norma Wright, Paul T. Yu, and Isabel Yu, Defendants.

In re W/B Associates[1].

Bankruptcy Nos. 00–21564 (JKF), 98–21139 (JKF).
Adversary No. 00–2679 (JFK).

United States Bankruptcy Court, W.D. Pennsylvania.

Jan. 31, 2005.

1. The Clerk shall enter this Memorandum and the accompanying Order in both Adversary Proceeding 00–2679 and in Bankruptcy Case 98–21139. This Memorandum constitutes the court's findings of fact and conclusions of law.

Richard A. DeTar, Esquire, Easton, MD, for Plaintiff.

Robert J. Ridge, Esquire, Elene Mountis Moran, Esquire, Thorp, Reed & Armstrong, LLP, Pittsburgh, PA, for Defendants.

## MEMORANDUM OPINION

JUDITH K. FITZGERALD, Chief Judge.

### Introduction

Before the court is another proceeding in the tortuous path that has resulted in numerous bankruptcies in this district, all as the result of actions by Aubrey Gladstone ("Gladstone") and persons or entities affiliated with him. The interrelationships of the entities are excruciating in their complexity.

The present matter involves an Adversary Complaint (the "Complaint" at Dkt. no. 1) filed by the Debtor/Plaintiff, Estate Partners, Ltd. ("Estate Partners" or "Debtor") and a Motion to Dismiss filed by the Defendants ("W/B Guarantors"). Following oral argument on the Motion to Dismiss held on January 22, 2002, both

Estate Partners and the W/B Guarantors filed additional materials: (i) W/B Guarantors' Motion to Strike Plaintiff Debtor's Post–Hearing Supplementation or, in the Alternative, Reply to Debtor's Post–Hearing Supplementation, at Dkt. no. 28 and (ii) Estate Partners' Response thereto, at Dkt. no. 29. We have reviewed the arguments and authorities in these submissions in addition to those filed before January 22, 2002.[2] We will consider the Motion to Strike as a reply to Debtor's Post–Hearing Submission.

The W/B Guarantors are limited partners of a Pennsylvania real estate syndication named W/B Associates. W/B Associates was created to finance and guarantee the purchase, management, and leasing of an office building in Wilkes–Barre, Pennsylvania (the "Wilkes–Barre Building"). In the Complaint, Estate Partners asserts that it is the owner of 22 guarantee agreements (the "W/B Guarantees") executed by the W/B Guarantors during the formation of the limited partnership.[3]

Specifically, Estate Partners' Complaint argues that the W/B Guarantors have breached that provision in the W/B Guarantees of a pro rata payment of 1/20th of a promissory note which fell into default (the "W/B Note"). The W/B Note was given to Tri–State Management Services, Inc. ("TSM") as compensation for the first five years of management services of the Wilkes–Barre Building. Estate Partners further contends that

> [e]ach Guarantee expressly provides that the Guarantor's obligation ... shall be a continuing, absolute and unconditional guarantee and shall remain in full force and effect until the Partnership shall have fully and satisfactorily discharged its obligation to [TSM] under the Note ..."

Complaint, ¶ 15.

The W/B Note and Guarantees, Estate Partners alleges, matured and became due and owing on December 31, 1997. As of December 20, 2000, the date the Complaint was filed, Estate Partners claims the cumulative amount due and owing on the W/B Guarantees was $2,685,073 and asks for judgment against each W/B Guarantor for a pro rata share (in the amount of $132,911 or 4.95% per unit), plus additional interest accruing from December 15, 2000, and reasonable legal fees and costs in connection with collection efforts.

The W/B Guarantors move for summary judgment on the grounds that the W/B Guarantees are not property of Estate Partners' bankruptcy estate.[4] The W/B

---

2. The submissions of the parties in this proceeding date as far back as 1982 and include, *inter alia*, various documents and transcripts from state court proceedings in New York and Ohio, state trial and appellate proceedings in Pennsylvania, a bankruptcy proceeding in the Southern District of Florida, and multiple proceedings in the bankruptcy and district courts of the Western District of Pennsylvania and the United States Court of Appeals for the Third Circuit.

3. There were twenty limited partners, but twenty-two Guarantees were sold, including sales of half units.

4. The motion to dismiss was supported in W/B Guarantors' Brief in Support of Motion to Dismiss, Docket No. 5 at 3–4. In W/B Guarantors' Motion to Strike Debtors' Post–Hearing Supplementation or, in the Alternative, Reply to Debtors' Post–Hearing Docket No. 28 at 2–3, W/B Guarantors changed their motion to one for summary judgment. Under Fed.R.Civ.P. 56(c), made applicable in these proceedings by Fed. R. Bankr.P., Rules 9014 and 7056, summary judgment is appropriate only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In considering a motion for summary judgment, the court must review the record, arguments of counsel, pleadings, and inferences in a light most favorable to

Guarantors argue that Estate Partners came into possession of the W/B Guarantees through two Allegheny County, Pennsylvania Sheriff's sales that rested upon a debt (the "SLAC Judgment"[5]) that had already been satisfied. Specifically, W/B Guarantors argue that the U.S. Trust Note,[6] of which TSM was a co-guarantor, was satisfied when it was sold in a Uniform Commercial Code § 9–505(2)[7] strict foreclosure transaction, as authorized by the order of the Honorable Robert Kraft, Judge of the Court of Common Pleas, Hamilton County, Ohio on April 18, 1988.[8] The strict foreclosure pursuant to UCC § 9–505(2) also released from liability on the U.S. Trust Note any secondary obligors, including TSM. Therefore, according to the W/B Guarantors, satisfaction of the U.S. Trust Note extinguished the SLAC Judgment against the guarantors of the U.S. Trust Note, one of which was TSM. As the SLAC Judgment no longer existed, it would not have been available to provide the mechanism by which Estate Partners obtained the writ of execution against TSM and the subsequent Sheriff's sales of TSM assets through which Estate Partners obtained the W/B Guarantees.

Alternatively, the W/B Guarantors move for summary judgment on the grounds that the SLAC Judgment was void as a fraudulent conveyance and could not serve as the mechanism by which Estate Partners obtained possession of the W/B Guarantees.

The court finds that the W/B Guarantors cannot prevail on their first issue because the Superior Court of Pennsylvania has determined that the SLAC Judgment "remained viable and was not extinguished by the Ohio proceedings."[9] The Superior Court Judgment was a final judgment and its determination that the SLAC Judgment was not extinguished is binding on this court under the Full Faith and Credit Act, 28 U.S.C. 1738 (2003). Because the

---

Estate Partners, the party opposing the motion.

5. This judgment will be described below. SLAC refers to the Savings and Loan Assurance Corporation of Ohio.

6. This memorandum will provide more information about the notes in the Background section below. However, it may be useful for clarity at this point to preview several terms that will appear throughout this memorandum. The court will examine two notes together with their guarantors and guarantees. The first note, the U.S. Trust Note, was an instrument executed in the 1980s in exchange for which several companies controlled by Gladstone received loans; the U.S. Trust Guarantors were five other companies controlled by Gladstone that guaranteed, jointly and severally, the U.S. Trust Note; that guaranty is identified herein as the U.S. Trust Guaranty; one of the U.S. Trust Guarantors was TSM. The second note is the W/B Note which, along with the W/B Guarantors and W/B Guarantees, have been described earlier in this memorandum. It should be empha-

sized that the two notes are completely unrelated. The sole point of contact between the two notes is TSM. TSM was the owner of several of the W/B Guarantees and TSM's alleged default as coguarantor of the U.S. Trust Note resulted in a series of events by which Plaintiff got possession of the W/B Guarantees.

7. All references to the Uniform Commercial Code in this opinion are to the New York implementation of the UCC that was in effect in 1988. For convenience, the full citation of any particular provision, such as "NY CLS UCC § 9–505(2)" will be shortened to "UCC § 9–505(2)."

8. *In the Matter of the Liquidation of Valleywood Savings Association*, Cincinnati Ohio, No. A–8604609 (April 18, 1988) (the "Ohio Proceedings").

9. *James A. Budzak, M.D., et al. v. Estate Partners, Ltd. et al.*, No. 991 Pittsburgh (Pa. Superior 1998) Judgment at p. 31; *rearg. denied*, 726 A.2d 1073 (Pa.Super.1998) (Table) (hereinafter, the "Superior Court Judgment").

SLAC Judgment was not extinguished prior to the Sheriff's sales, the Sheriff's sales of the TSM assets through which Estate Partners obtained the W/B Guarantees were not void.

The court also finds that the transfer of the SLAC Judgment from Gladstone to Estate Partners, although a fraudulent conveyance, was not thereby void and passed at least bare legal title of the SLAC Judgment to Estate Partners. Consequently, the Sheriff's sales through which Estate Partners came into possession of the W/B Guarantees were not void.

## BACKGROUND

*From the Formation of W/B Associates to the Guaranty of the U.S. Trust Note*

At the relevant times, Gladstone was a businessman involved in many real estate transactions. He was an officer of both Tax Sheltered Investments Inc. ("TSI") and TSM as well as an officer and/or shareholder of several other entities related to this controversy: National Leasing Corporation ("NLC"), American Equity Corporation ("AEC"), TMT Properties Inc. ("TMT"), 21st Century Equity, Inc. ("21CE"), and 21st Century Equity, Inc., I ("21CEI"). At the relevant times, Thomas S. Evans ("Evans") was a business associate of Gladstone and an officer, director and shareholder of 21CE, AEC, TSI, TSM, TMT and NLC.

In 1982, Gladstone formed W/B Associates, a Pennsylvania limited partnership of which TSI was general partner, to purchase, lease, and manage the Wilkes–Barre Building. W/B Associates contracted with TSM to manage the Wilkes–Barre Building for five years, in return for which, among other consideration, W/B Associates issued to TSM a promissory note for $285,000 as payment for the organizational fee and the five-year management fee (the "W/B Note").

W/B Associates offered for sale 20 limited partnership interests or "units"; each unit was equivalent to a 4.95 percent share of W/B Associates.[10] Each Limited Partner executed guarantees of payment to TSM for 1/20th of the W/B Note per full unit in the event of default (the 22 W/B Guarantees). By January 1983, W/B Associates had subscription agreements for all 20 limited partnership units. The W/B Note and the W/B Guarantees contain language providing that they are to be construed under the laws of the State of New York.

Following the formation of W/B Associates, NLC purchased from Penn Place Associates ("Penn Place") an Installment Sales Agreement for the sale of the Wilkes–Barre Building. This Installment Sales Agreement had been entered into in 1974 by Penn Place and the Wilkes–Barre Development Authority. There was also a first mortgage on the Wilkes–Barre Building held by First Valley Bank. NLC, Penn Place and First Valley Bank executed an Agreement of Consent on January 12, 1983, which authorized NLC to assign the Installment Sales Agreement to W/B Associates in exchange for a second, wraparound mortgage on the Wilkes–Barre Building.

In 1985, TSM entered into a guaranty agreement along with several other Gladstone entities. Three corporations, 21CE, 21CEI, and NLC, obtained a $750,000 loan from United States Trust of New York ("U.S.Trust") and in return executed an Assignment and Pledge Agreement to U.S. Trust (the "U.S. Trust Note"). At the same time, AEC, TSI, TSM, and TMT

---

10. TSI, the general partner, retained a 1 percent interest.

executed a guaranty as security for the $750,000 loan by U.S. Trust to 21CE, 21CEI, and NLC (the "U.S. Trust Guaranty"). All of these instruments contained New York choice-of-law provisions.

On May 24, 1985, U.S. Trust, 21CE, 21CEI and NLC agreed to amend the original loan. NLC was removed as a borrower and added as a guarantor and the original loan was increased from $750,000 to $1 million. Also on May 24, 1985, AEC, TSI, TSM, TMT and NLC (the "U.S. Trust Guarantors") executed an Increase and Confirmation to Guaranty of Payment for the U.S. Trust Note. The U.S. Trust Guarantors also unconditionally guaranteed the U.S. Trust Note. The U.S. Trust Note was secured by four wraparound mortgages from various partnerships in favor of 21CE (the "Four Wraps"). These instruments contained New York choice-of-law provisions.

Subsequently on July 26, 1985, Valleywood Savings Association ("Valleywood") of Ohio became the obligor on the U.S. Trust Note when Gladstone and Evans sold it the stock of 21CE and 21CEI. The Ohio Savings and Loan Assurance Corporation ("SLAC") loaned part of the purchase amount to Valleywood.

*The Ohio and New York Proceedings*

On June 12, 1986, SLAC placed Valleywood in receivership in Ohio. Pursuant to Ohio Rev.Code § 1157.10(A)(C), the Superintendent of the Division of Savings and Loan Associations, Department of Commerce, State of Ohio (the "Superintendent"), as the statutory liquidator, was vested with title to all the institution's assets by operation of law.

Valleywood defaulted on the U.S. Trust Note on August 1, 1986. Valleywood's largest single creditor, SLAC, on September 18, 1986, purchased the U.S. Trust Note from U.S. Trust for $825,000. Valleywood assigned the U.S. Trust Note, the U.S. Trust Guaranty, and the Four Wraps to SLAC.

SLAC could not proceed against Valleywood for the collateral because Valleywood was in receivership. Therefore, on October 20, 1986, SLAC made its demand on the U.S. Trust Guarantors. In 1987, SLAC filed a Motion for Summary Judgment in Lieu of Complaint against the U.S. Trust Guarantors in New York. On July 15, 1987, the New York court entered judgment in favor of SLAC for $1 million plus interest against the U.S. Trust Guarantors, jointly and severally.[11] SLAC recorded the SLAC Judgment against the U.S. Trust Guarantors in the Court of Common Pleas of Allegheny County, Pennsylvania. Based on the SLAC Judgment, SLAC filed an involuntary bankruptcy proceeding against NLC in the Western District of Pennsylvania.

In April of 1988, a number of pleadings were filed in the Court of Common Pleas, Hamilton County, Ohio, with Judge Kraft, who presided over the Valleywood liquidation estate, seeking discharge of the entire obligation owed to SLAC on the U.S. Trust Note.[12]

Gladstone and SLAC attempted to negotiate a settlement of the NLC involuntary bankruptcy when Gladstone proposed to pay, and SLAC to accept, $1 million in exchange for the U.S. Trust Note and the collateral of the Four Wraps. This transaction would have extinguished the U.S.

---

11. *The Savings and Loan Assurance Corp. v. American Equity Corp., et al.,* Index No. 9228/87 (N.Y. Supreme Court, New York County, July 15, 1987).

12. *In the Matter of the Liquidation of Valleywood Savings Association,* No. A–8604609 (Common Pleas Court, Ohio).

Trust Guaranty. The Superintendent objected to the settlement because it would allow Evans and Gladstone to purchase the $1,440,000 debt of the Valleywood liquidation estate for only $1,000,000. The Superintendent refused to consent to any transaction that might allow the holder of the U.S. Trust Note to foreclose against Valleywood in another state, sell the collateral in a commercially unreasonable fashion, and present an unsecured deficiency claim against Valleywood.

Instead, in her Memorandum accompanying the Motion for Order Approving Allowance of Claim, and Authorizing Surrender of Assets to the Savings and Loan Assurance Corporation and Approving Form and Manner of Notice (the "Liquidation Motion"), the Superintendent proposed that the Ohio court approve SLAC's proposal pursuant to UCC § 9-505(2) and that Valleywood surrender the Four Wraps to SLAC in full satisfaction of the secured obligation, relieving the liquidation estate of a potentially large unsecured deficiency claim. SLAC would then hold title to the Four Wraps and, under a separate agreement with Evans and Gladstone, would transfer the wraps for $1 million.

Judge Kraft entered an order on April 18, 1988, authorizing the Superintendent to surrender and transfer to SLAC title of the Four Wraps securing the U.S. Trust Note in satisfaction of the note, acknowledging that the Superintendent had determined that SLAC had a valid priority security interest in the Four Wraps, that there was no equity in the Four Wraps for the Valleywood liquidation estate, and that the Superintendent believed surrender of the collateral in full satisfaction of the obligation to be in the best interests of the creditors of Valleywood.

On May 1, 1988, a letter from SLAC's counsel advised the Superintendent's counsel that SLAC would not convey the U.S. Trust Note and that the note would be returned to Valleywood's liquidation estate marked paid in full. SLAC further agreed with Evans and Gladstone to terminate the involuntary bankruptcy of NLC.

In May of 1988, Gladstone and Harmar Properties entered into negotiations to purchase the U.S. Trust Note, the SLAC Judgment and the Four Wraps from SLAC.

On June 8, 1988, the U.S. Trust Guarantors, including TSM, executed agreements with Gladstone purporting to continue their liability for any deficiency between the amount paid and the amount still owing on the debt.

On June 9, 1988, SLAC, Valleywood, Gladstone and Harmar completed the transfer of the SLAC Judgment and the Four Wraps from Valleywood through SLAC to Gladstone and Harmar. The SLAC Judgment was assigned to Gladstone and the assignment was filed in Allegheny County, Pennsylvania at GD 87-16282.

On or near June 28, 1988, counsel for SLAC sent the original copies of the U.S. Trust Note and U.S. Trust Guaranty to Valleywood by mail.

### Debtor Estate Partners Acquires the W/B Guarantees

On January 29, 1992, Gladstone transferred by assignment to Estate Partners certain assets, including the SLAC Judgment. At the time of the transfer, the sole limited partner of Estate Partners was Marianne R. Gladstone, Gladstone's wife. The general partner was Bomar Builders Inc., a Florida Corporation ("Bomar").

Estate Partners obtained in Allegheny County a Writ of Execution against TSM based on the SLAC Judgment. A Sheriff's Sale was held on April 2, 1992, at which Bomar acquired several of the W/B

Guarantees which still remained in the possession of TSM.

On July 9, 1992, Estate Partners obtained another Writ of Execution against TSM, which named First Valley Bank as garnishee. Judge Doyle of the Court of Common Pleas of Allegheny County issued an order requiring First Valley Bank to surrender the W/B Partnership Note and the W/B Guarantees in its possession to the Sheriff of Allegheny County for sale.

On August 3, 1994, another Sheriff's Sale was held at which Estate Partners was the successful bidder for the W/B Partnership Note and six (6) additional W/B Guarantees.

In 1993, Bomar sold the 14 Guarantees it owned to Family Investments, Inc. ("Family Investments"). In 1998, Family Investments transferred the 14 Guarantees to Estate Partners. Consequently, after 1998, Estate Partners was the purported owner of all 22 W/B Guarantees.

*Procedural History Leading to
the Instant Proceeding*

The W/B Guarantors filed a Declaratory Judgment Petition in the Court of Common Pleas of Allegheny County on November 17, 1993, against Estate Partners, Bomar, and TSM, in which W/B Guarantors argued that Estate Partners and Bomar, with the assistance of TSM, intended to confess judgment against them under the W/B Note and W/B Guarantees. The petition sought a declaration that the W/B Guarantees were null and void and that the W/B Note was not in default or, in the alternative, that Estate Partners and Bomar be enjoined from bringing any action for payment under the W/B Note or Guarantees. Gladstone was made an involuntary plaintiff because W/B Associates alleged that he owned five of the limited partnership units and Estate Partners and

Bomar stated in their answer to the 1993 action that Gladstone had executed five guarantee agreements. Estate Partners and Bomar filed preliminary objections.

On November 2, 1994, Estate Partners confessed judgment against W/B Associates for $2,003,753.00. The W/B Guarantors filed an Amended Declaratory Judgment Petition with the Court of Common Pleas.

Upon Estate Partners' and Bomar's preliminary objections, Judge Friedman of the Court of Common Pleas entered an order requiring joinder of the remaining W/B Guarantors whose Guarantees had not been liened by the Sheriff. Additionally, Theodore Paul's joinder was ordered because he claimed to own the W/B Note and had pending a separate equitable action. Paul's separate action was removed to federal district court.[13]

On June 28, 1996, the Court of Appeals for the Third Circuit established in *Paul v. Gladstone,* 91 F.3d 125 (3d Cir.1996) (Table) (Unpublished), that the transfer from Gladstone to Estate Partners was arranged by Gladstone with the actual intent to defraud Theodore Paul, one of Gladstone's creditors. Accordingly, the Third Circuit remanded and directed the United States District Court for the Western District of Pennsylvania to enter judgment on behalf of Theodore Paul. On remand, Judge Donald E. Ziegler entered an Order dated September 19, 1996, which provided that the transfer of the assets from Gladstone to Estate Partners on January 29, 1992, was set aside and a constructive trust was imposed over a number of Gladstone's assets, including the execution on the SLAC Judgment at G.D. No. 87–16282, to the extent necessary to satisfy Paul's claim.

---

13. Civil Action 93–02125, W.D.Pa.

W/B Associates' Motion for Summary Judgment was denied by Judge Friedman of the Allegheny County Court of Common Pleas on October 14, 1996.

After additional discovery, W/B Associates filed a new motion for summary judgment on January 31, 1996, and it was assigned to Judge James, who granted the motion by order dated May 1, 1996, declaring that any right, title, or interest of Estate Partners, Bomar, or any other person or entity, in the SLAC Judgment was extinguished by the Ohio Proceedings. Judge James' order also declared void all Sheriff's sales to Estate Partners, Ltd., Bomar or anyone acting on their behalf, concerning the W/B Note and W/B Guarantees. It further required Estate Partners and Bomar and the Allegheny County Sheriff to deliver the W/B Note and all W/B Guarantees to TSM. After Judge James denied Estate Partners' and Bomar's Motion for Reconsideration, Estate Partners and Bomar filed a Notice of Appeal to the Superior Court on May 29, 1996.

The Pennsylvania Superior Court's opinion in 1998 voided Judge James' 1996 order. The Superior Court agreed that Valleywood's obligation to SLAC under the U.S. Trust Note was extinguished by the transfer by Valleywood to SLAC of the Four Wraps pursuant to Judge Kraft's order and with the appellant's contention that the satisfaction of the U.S. Trust Note was completed only upon the delivery of the Note to the Valleywood liquidation estate by the counsel for SLAC. It held that the terms of the U.S. Trust Guaranty, under which TSM was a signatory, altered the normal operation of law and precluded TSM's automatic discharge and that consequently, it was "clear from the four corners" of the U.S. Trust Note that TSM agreed to continue its liability until the entire sum due and owing under the U.S.

Trust Note was paid. Superior Court Judgment at 31. The Superior Court remanded the case to Judge James for consideration of all claims raised in the original petition.

During oral argument on September 1, 1999, Judge James indicated his intention to grant the motion for summary judgment in favor of the W/B Guarantors. He delayed entry of an order based on representations by Gladstone that he could prove that counsel for W/B Guarantors had deliberately failed to attach a draft agreement which would substantiate the arguments he proffered in opposition to the motion.

Estate Partners filed for protection under Chapter 11 of the Bankruptcy Code in the Southern District of Florida on September 3, 1999. On September 7, 1999, Judge James granted summary judgment in favor of the W/B Guarantors. On February 4, 2000, the Estate Partners' Chapter 11 case was transferred to the Western District of Pennsylvania. On December 18, 2000, the September 7, 1999, summary judgment order of Judge James was declared void *ab initio* by this court as entered in violation of the automatic stay.

## ANALYSIS

### Jurisdiction

The W/B Guarantors argue that the W/B Guarantees are not property of Estate Partners' bankruptcy estate and, consequently, this court does not have subject matter jurisdiction over them. The court finds that it does have subject matter jurisdiction because Estate Partners has, at a minimum, bare legal title to the W/B Guarantees which is sufficient to assert bankruptcy court jurisdiction pursuant to § 541(a) and (d) of the Bankruptcy Code.

Estate Partners came into possession of the W/B Guarantees as a result

of two Sheriff's sales that were authorized by orders of the Court of Common Pleas of Allegheny County.[14] A Sheriff's sale pursuant to a court order vests title in the purchaser and cannot be set aside except for fraud in the purchase or lack of authority in the Sheriff. *Concord–Liberty Savings & Loan Ass'n v. NTC Properties, Inc.*, 454 Pa. 472, 312 A.2d 4 (1973); *Garrison v. Erb*, 424 Pa. 306, 227 A.2d 848 (1967); *Knox v. Noggle*, 328 Pa. 302, 196 A. 18 (1938); *Lengert v. Chaninel*, 208 Pa. 229, 57 A. 561 (1904). The Sheriff's sales had not been successfully set aside before the filing of Estate Partners' bankruptcy petition.[15] Therefore, at the time of the filing of Estate Partners' bankruptcy petition, Estate Partners held at least bare legal title to the W/B Guarantees, which is sufficient to invoke bankruptcy court jurisdiction pursuant to § 541(a) and (d) of the Bankruptcy Code.

The court concludes that the W/B Guarantees were property of the estate at the time of the filing of Estate Partners' bankruptcy petition. The W/B Guarantors' objection to their inclusion in the bankruptcy estate is a question dealing with the administration of the estate, making this a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A). Venue is proper pursuant to 28 U.S.C. § 1408(1).

### Issues Before the Court and Controlling Law

The central issues before this court are (i) As a result of an alleged strict foreclosure of the U.S. Trust Note in the Ohio Proceedings pursuant to UCC § 505(2) that extinguished all liabilities on the U.S. Trust Note, including TSM's secondary obligation under the U.S. Trust Guaranty,

was the SLAC Judgment against TSM on account of its secondary obligation also extinguished and consequently not available as a mechanism by which Estate Partners obtained the W/B Guarantees? and (ii) Was the fraudulent conveyance of the SLAC Judgment from Gladstone to Estate Partners void?

■ The documents under consideration in the W/B Guarantors' first issue are the U.S. Trust Note, the U.S. Trust Guaranty and the SLAC Judgment. The SLAC Judgment was an action of a New York state court and its interpretation is thus governed by New York law.

■ Both the U.S. Trust Note and the U.S. Trust Guaranty have provisions that their interpretation shall be in accordance with the laws of the State of New York. As a general principle, we honor the intent of the contracting parties and give effect to a choice of law provision in a particular contract. The other option in this matter is to apply the contract law of this court's forum state, Pennsylvania. However, the highest court of Pennsylvania to consider these documents deferred to New York law for their interpretation:

> Because of the express choice of law provision in the GUARANTY OF PAYMENT [the U.S. Trust Guaranty] and because the SLAC JUDGMENT was entered in New York based on the GUARANTY OF PAYMENT, we must apply principles of New York law to resolve the question of what effect the transfer of assets to satisfy the U.S. Trust Note authorized by Judge Kraft's order had on the SLAC JUDGMENT.

Superior Court Judgment at 28.

We find persuasive the decision of an appellate court in our forum state choosing

---

14. Estate Partners did not come into possession of all the W/B Guarantees until 1998. See the background discussion above for the process by which Estate Partners came into possession of the W/B Guarantees.

15. Judge James' order of May 1, 1996 voiding the Sheriff's sales was reversed in the Superior Court Judgment.

to apply New York law in interpreting the same documents now before this court on similar issues. Therefore, the court will evaluate the U.S. Trust Note and U.S. Trust Guaranty in accordance with the laws of New York.

Regarding the W/B Guarantors' second issue, we will apply the law of Pennsylvania in effect at the time of the fraudulent conveyance, the Pennsylvania Fraudulent Conveyance Act, 39 Pa.Stat.Ann §§ 351–363 (Purdon 1954) (repealed).

Regarding the effect of the Superior Court Judgment on this court's deliberations, we will apply Pennsylvania or federal law as appropriate.

**Law of the Case and Issue Preclusion**

Estate Partners argues that the doctrines of law of the case and issue preclusion bar the court from considering the W/B Guarantors' argument that a strict foreclosure under UCC § 9–505(2) resulted in the complete satisfaction of the underlying debt of the U.S. Trust Note and the extinguishment of the SLAC Judgment against the U.S. Trust Guarantors. For the reasons below, the court does not find merit in Estate Partners' argument concerning law of the case but agrees with Estate Partners that issue preclusion applies.

Estate Partners' arguments are based on the Superior Court Judgment. The Superior Court reached the following conclusions regarding the U.S. Trust Note and the U.S. Trust Guaranty:

> We agree with the trial court that Valleywood's obligation to SLAC under the U.S. Trust Note was extinguished due to the transfer by Valleywood to SLAC of the four wraparound mortgages pursuant to Judge Kraft's order.... Thus, absent an agreement to the contrary, under normal operation of New York law, TSM's liability to SLAC as guaran-

tor of the U.S. Trust Note would have ceased once the U.S. Trust Note was returned to the Valleywood liquidation estate.... However, the terms of the GUARANTY AGREEMENT under which TSM was a signatory, altered the normal operation of law and precluded TSM's discharge.... Consequently, it is clear from the 'four corners' of the GUARANTEE OF PAYMENT that TSM agreed to continue its liability until the entire sum due and owing under the U.S. Trust Note was paid.... SLAC expressly acknowledged that it did not receive full payment under the U.S. Trust Note. Hence, TSM's liability pursuant to the GUARANTY OF PAYMENT continued for the outstanding balance of the U.S. Trust Note since the total sum due under the U.S. Trust Note was not paid in full. Therefore, because of TSM's continuing liability, the SLAC JUDGMENT which Gladstone purchased, remained viable and was not extinguished by the Ohio proceedings.

Superior Court Judgment at 28–32 (capitalized terms in the original).

Estate Partners argues that the law of the case doctrine restricts the ability of a trial court to hear and rule on matters already decided by an appellate court, citing to the Pennsylvania Supreme Court in *Com. v. Starr*, 541 Pa. 564, 664 A.2d 1326 (1995) (a trial court may not alter the resolution of a legal question previously decided by the appellate court in the matter). The law of the case doctrine, urges Estate Partners, barred Judge James from hearing and considering on remand the W/B Guarantors' argument that a strict foreclosure under UCC § 9–505(2) extinguished the SLAC Judgment and any obligations on that judgment.

This court is not an appellate court having jurisdiction to determine the law of the case in the state action nor a trial court

subordinate to the appellate authority of the Superior or Supreme Courts of Pennsylvania. Whether Judge James' summary judgment proceeding complied with the Superior Court's order on remand is irrelevant to this Adversary Proceeding. This Adversary Proceeding was not removed from the state courts to this court. This proceeding was filed originally in this court after Estate Partners' Chapter 11 case was transferred here from the Southern District of Florida and deals with administration of the property of Estate Partners' bankruptcy estate. It is therefore an exclusively federal proceeding arising under Title 11 of the United States Code.

■ For federal court proceedings, the United States Supreme Court has defined the law of the case as a doctrine that " 'posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages *of the same case.*' " *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988), quoting *Arizona v. California*, 460 U.S. 605, 618, 103 S.Ct. 1382, 75 L.Ed.2d 318, *rehearing denied* 462 U.S. 1146, 103 S.Ct. 3131, 77 L.Ed.2d 1381 (1983), *decision supplemented* 466 U.S. 144, 104 S.Ct. 1900, 80 L.Ed.2d 194 (1984) (emphasis added). Since this Adversary Proceeding is an original proceeding and was not removed to this court from the state courts, it is not the same case as that decided in the Superior Court Judgment. Therefore, this court finds that the Superior Court Judgment is not binding on this court under the law of the case doctrine.

■ Estate Partners also argues that the W/B Guarantors' strict foreclosure argument is barred by issue preclusion pursuant to the Full Faith and Credit Act, 28 U.S.C. § 1738. Estate Partners maintains that the W/B Guarantors' argument is but a subtle nuance in the legal argument predicated on the same facts presented to the Superior Court. We agree with Estate Partners' issue preclusion argument.

■ The United States Court of Appeals for the Third Circuit has instructed federal courts of this circuit to "inquire into the scope of state preclusion law when applying the full faith and credit statute to a prior state court judgment." *Grimes v. Vitalink Communications Corp.*, 17 F.3d 1553, 1562 (3d Cir.1994) *cert. denied* 513 U.S. 986, 115 S.Ct. 480, 130 L.Ed.2d 393 (1994). The Court of Appeals has given us guidelines for investigating the scope of Pennsylvania issue preclusion law:

> Under Pennsylvania law, issue preclusion applies where:
>
> (1) the issue decided in the prior adjudication was identical with the one presented in the later action;
>
> (2) there was a final judgment on the merits;
>
> (3) the party against whom the plea is asserted was a party or in privity with a party to the prior adjudication; and
>
> (4) the party against whom it is asserted has had a full and fair opportunity to litigate the issue in question in a prior action.

*Greenleaf v. Garlock, Inc.*, 174 F.3d 352, 357–58 (3d Cir.1999).

We turn now to the first *Garlock* criterion, that the issue decided in the prior adjudication is identical with the one presented in the later action.

The issue in the present action presented by W/B Guarantors is: as a result of an alleged strict foreclosure of the U.S. Trust Note in the Ohio Proceedings pursuant to UCC § 505(2) that extinguished all liabilities on the U.S. Trust Note, including TSM's secondary obligation under the U.S. Trust Guaranty, was the SLAC Judgment

against TSM on account of its secondary obligation also extinguished and consequently not available as a mechanism by which Estate Partners obtained the W/B Guarantees? The Superior Court Judgment explicitly decided in the negative:

> [B]ecause of TSM's continuing liability, the SLAC JUDGMENT which Gladstone purchased, remained viable and was not extinguished by the Ohio proceedings.

Superior Court Judgment at 32.

The dispute between W/B Guarantors and Estate Partners on this issue concerns the legal theory by which the U.S. Trust Note was satisfied and the effect of the satisfaction on the secondary obligors. W/B Guarantors argue strenuously that the U.S. Trust Note was satisfied in a UCC § 9–505(2) strict foreclosure that extinguished all obligations on the U.S. Trust Note, including the secondary obligation of TSM under the U.S. Trust Guaranty. Estate Partners argues strenuously that the Ohio Proceedings did not result in a UCC § 9–505(2) transaction, and even if this was a UCC § 9–505(2) transaction, New York law will still enforce the U.S. Trust Guaranty's provision that liability for a deficiency on the transaction would survive an act which might be deemed a legal or equitable discharge of surety.

This court has reviewed the Superior Court Judgment and the complete record on appeal upon which the Superior Court based its judgment. Nowhere in the judgment or the record is there a reference to UCC § 9–505(2).[16] However, the Superior Court clearly stated that it would "apply principles of New York law to resolve the question of what effect the transfer of assets to satisfy the U.S. Trust Note authorized by Judge Kraft's order had on the SLAC JUDGMENT." Superior Court Judgment at 28. The Superior Court found that:

> Thus, absent an agreement to the contrary, under normal operation of New York law, TSM's liability to SLAC as guarantor of the U.S. Trust Note would have ceased once the U.S. Trust Note was returned to the Valleywood liquidation estate.... However, the terms of the GUARANTY OF PAYMENT [the U.S. Trust Guaranty] under which TSM was a signatory, altered the normal operation of law and precluded TSM's automatic discharge.

Superior Court Judgment at 29–30.

This court has no way of determining if the Superior Court, in reaching its judgment, considered the New York law of a strict foreclosure under UCC § 9–505(2). However, we have the Superior Court's unequivocal statement that it examined the "normal operation of New York law" and that the U.S. Trust Guaranty "altered the normal operation of law and precluded TSM's automatic discharge." *Id.*

The court concludes that the Superior Court of Pennsylvania, applying New York law, determined that the U.S. Trust Guaranty signed by TSM precluded the automatic discharge of TSM's obligations under the U.S. Trust Guaranty and, because of TSM's continuing liability, the SLAC Judgment, which Gladstone purchased, remained viable and was available to serve as the mechanism by which Estate Partners obtained possession of the W/B Guar-

---

16. The first time the UCC § 9–505(2) argument was presented was in the Motion for Reconsideration of the Superior Court Judgment. The Superior Court denied the Motion for Reconsideration without an opinion. This court notes that the Superintendent's Memo-randum accompanying the Liquidation Motion in the Ohio Proceedings, in which she advised the court that she was seeking a UCC § 9–505(2) strict foreclosure transaction, was apparently not included in the record on appeal to the Superior Court.

antees. This finding by the Superior Court addresses the first issue raised by the W/B Guarantors of whether the SLAC Judgment was void at the time of the Sheriff's sales and consequently not available as a mechanism by which Estate Partners obtained the W/B Guarantees. Therefore, this court finds that the first *Garlock* criterion for issue preclusion, that the issue decided in the prior adjudication is identical with the one presented in the later action, is satisfied.

The second *Garlock* criterion for issue preclusion is that there was a final judgment on the merits. The Court of Appeals opinion in *Garlock* also provides guidelines for analysis of a final judgment under Pennsylvania law:

> The Pennsylvania Supreme Court consults section 13 of the Restatement (Second) of Judgments to define "final judgments" for purposes of issue preclusion. Section 13 provides: The rules of res judicata are applicable only when a final judgment is rendered. However, for purposes of issue preclusion (as distinguished from merger and bar), "final judgment" includes any prior adjudication of an issue in another action that is determined to be sufficiently firm to be accorded preclusive effect. RESTATEMENT (SECOND) OF JUDGMENTS § 13 (1982). The comments to section 13 emphasize that issue preclusion is applicable when it is determined "that the decision to be carried over was adequately deliberated and firm, even if not final in the sense of forming the basis for a judgment already entered." *Id.* § 13 cmt. g.... Accordingly, the Restatement recognizes that the finality inquiry focuses upon "whether the conclusion in question is procedurally definite." *Id.* Section 13's comments provide a number of factors

to be considered in this regard: (1) whether the prior decision was "adequately deliberated and firm" and not "avowedly tentative"; (2) whether the parties were fully heard; (3) whether the court supported its decision with a reasoned opinion; (4) whether the court's prior decision was subject to appeal or was in fact reviewed on appeal. *Id.*

*Garlock* at 358.

This court finds that the Superior Court Judgment was adequately deliberated and firm and not avowedly tentative. The decision was entered as a "Judgment" and the lower court decision was vacated and remanded for proceedings consistent with the memorandum of judgment. The Superior Court Judgment used the words:

> We emphasize for clarity that our *resolution of the issues* raised in this appeal does not end the underlying litigation.... There remain *other substantial genuine issues* of material fact raised by the limited partners [Estate Partners] and W/B Associates in their Amended Declaratory Judgment Petition.... We therefore remand this case to the trial court for consideration of all claims raised by the Amended Declaratory Judgment Petition.

Superior Court Judgment at 32 (emphasis added). The court interprets these words to mean that issues were resolved, including the viability of the SLAC Judgment, and that only the other issues raised in the Amended Declaratory Judgment Petition, which were not resolved in the Superior Court Judgment, were remanded to the trial court. Therefore, this court concludes that the Superior Court intended its disposition of the SLAC Judgment issue to be a final decision.[17]

17. The court takes note of the W/B Guarantors' argument that the Superior Court remanded the case to the trial court for consideration of "all claims" raised by the Amended

Second, the parties had an opportunity to be fully heard in the Superior Court proceedings. The record on appeal was voluminous and a hearing was held at which the parties were represented by attorneys. The court finds no indication that any party objected to the form or fairness of the Superior Court proceedings.

Third, the Superior Court Judgment was a reasoned opinion, reached by three judges of that court with considerable experience in the resolution of disputes in commercial litigation.

Fourth, the Superior Court Judgment was subject to appeal to the Pennsylvania Supreme Court but no appeal was taken.

Therefore, the court finds that the Superior Court Judgment satisfies the four requirements for finality of judgment and thus satisfies the second *Garlock* criterion for issue preclusion.

The third *Garlock* criterion for issue preclusion is that the party against whom the plea is asserted was a party or in privity with a party to the prior adjudication. This criterion is unquestionably met. All parties to the current controversy were parties in the prior adjudication.

The fourth *Garlock* criterion for issue preclusion, that the parties had a chance to be fully heard, was examined above in our consideration of finality of judgment. As noted above, the record on appeal in the Superior Court proceedings was voluminous, a hearing was held at which the parties were represented by attorneys and

no party objected to the form or fairness of the Superior Court proceedings.

After considering the four *Garlock* criteria, this court finds that the issue of the continuing viability of the SLAC Judgment decided in the Superior Court Judgment is identical to the first issue presented by the W/B Guarantors in the instant proceeding, that the Superior Court Judgment was a final judgment on the merits, that all parties in the instant proceeding were parties in the Superior Court proceedings and that the parties had a full and fair opportunity to litigate the issue in the Superior Court Proceedings. Therefore, the court concludes that the Superior Court's determination that the SLAC Judgment was not void at the time of the Sheriff's sales is binding on the parties under the doctrine of issue preclusion

**The Fraudulent Conveyance Issue**

█ W/B Guarantors argue that the transfer of the SLAC Judgment from Gladstone to Estate Partners was void as a fraudulent conveyance, "thereby depriving Estate Partners of title and the ability to seek or effectuate a sheriff's sale of the property." Defendants' Reply to Estate Partners, Ltd.'s Response to W/B Associates Limited Partners' Motion to Dismiss, Dkt. no. 13 at 16–17.

There can be no doubt that the transfer of the SLAC Judgment, as well as the other assets transferred from Gladstone to Estate Partners in 1992, was a fraudulent conveyance. This was determined by the United States Court of Appeals for the Third Circuit in *Paul v. Gladstone*, 91 F.3d 125 (3d Cir.1996), and repeated in the or-

Declaratory Judgment Petition and that this casts doubt on the finality of the Superior Court Judgment as regards one of those claims, the continuing viability of the SLAC Judgment. The court has examined the paragraph of the Superior Court Judgment where the "all claims" language appears and notes that it is the same paragraph that states cer-

tain issues are resolved and other issues are not resolved. The court concludes that the "all claims" language was a drafting error and that the Superior Court intended for the trial court only to examine those issues that had not been resolved in the Superior Court Judgment.

der of Judge Ziegler of the United States District Court for the Western District of Pennsylvania in *Paul v. Gladstone,* Civ. No. 93–2125 (September 19, 1996). At the direction of the Court of Appeals, Judge Ziegler set aside the fraudulent conveyance and imposed a constructive trust on the transferred assets to the extent necessary to satisfy Paul's claim.

It must be emphasized that neither the Court of Appeals nor the District Court *voided* the transfer of assets. A judicial determination that a transaction is void nullifies the transaction and deprives the receiving party of all rights in the property transferred. Nor is it correct, as W/B Guarantors argue, to equate "set aside" with "void." Rather, the Court of Appeals and the District Court fashioned a remedy for Paul's claim consistent with the Pennsylvania Fraudulent Conveyance Act in effect at the time of the fraudulent conveyance:

> When a conveyance or obligation is fraudulent as to a creditor, such creditor, when his claim has matured, may, as against any person except a purchaser for fair consideration without knowledge of the fraud at the time of the purchase, or one who has derived title immediately or mediately from such a purchaser:
>
> (a) Have the conveyance *set aside* or obligation annulled *to the extent necessary to satisfy his claim;* or
>
> (b) Disregard the conveyance, and attach or levy execution upon the property conveyed.

39 P.S. § 349(1) (repealed) (emphasis added).

The Court of Appeals and the District Court elected to set aside the fraudulent conveyance and imposed a constructive trust to the extent necessary to satisfy Paul's claim. The remedy chosen by the Court of Appeals and the District Court was tailored to the dispute between Paul and Gladstone. There is no indication in the orders of either the Court of Appeals or the District Court that they intended to nullify the transfer and return the assets to Gladstone. Indeed, the imposition of a constructive trust necessarily requires that the assets remain with the trustee, Estate Partners. Had the courts chosen to void the transfer of assets, they would have used the term "void" or at least granted Paul's request to declare Paul the owner of the assets.

The court finds that the orders of the Court of Appeals and the District Court, in setting aside and imposing a constructive trust on the SLAC Judgment, did not void the transfer of the SLAC Judgment and other assets. Since the transfer was not void, the execution on the SLAC Judgment and the Sheriff's sales through which Estate Partners obtained the W/B Guarantees were not void.

CONCLUSION

The court finds that W/B Guarantors cannot prevail on its first issue because the Superior Court of Pennsylvania has determined that the SLAC Judgment "remained viable and was not extinguished by the Ohio proceedings." Superior Court Judgment at 31. The Superior Court Judgment was a final judgment and binding on this court under the Full Faith and Credit Act, 28 U.S.C. § 1738 (2003). Since the SLAC Judgment was not extinguished prior to the Sheriff's sales, the Sheriff's sales of the TSM assets through which Estate Partners obtained the W/B Guarantees were not void.

The court also finds that the transfer of the SLAC Judgment from Gladstone to Estate Partners, although a fraudulent conveyance, was not void and passed at least bare legal title of the SLAC Judgment to Estate Partners. Consequently, the Sheriff's sales through which Estate Partners came into possession of the W/B Guarantees were not void.

W/B Guarantors' motion to dismiss the complaint, treated as a motion for summary judgment, is DENIED.

The court will schedule a pretrial conference to consider the remaining issues in the complaint.

The accompanying Order will be entered.

### ORDER

And now, this 31st day of January, 2005, for the reasons expressed in the foregoing memorandum, it is

ORDERED that Defendant's Motion to Dismiss, treated by the court as a Motion for Summary Judgment, is DENIED; and it is further

ORDERED that a pretrial conference in this adversary proceeding will be held on February 25, 2005 at 11:00 a.m. in Courtroom A, 54th Floor, U.S. Steel Building, 600 Grant Street, Pittsburgh, Pennsylvania 15219.